David J. Noonan, Esq. (SBN 55966)
  dnoonan@noonanlance.com
**NOONAN LANCE BOYER &
BANACH LLP**
701 Island Avenue, Suite 400
San Diego, California  92101
Telephone:   (619) 780-0880
Facsimile:    (619) 780-0877

Thomas H. L. Selby, Esq.*
  tselby@wc.com
Stanley E. Fisher, Esq.*
  sfisher@wc.com
Michael Mestitz, Esq.*
  mmestitz@wc.com
**WILLIAMS & CONNOLLY LLP**
680 Main Avenue SW
Washington, DC 20024
Telephone:   (202) 434-5000
Facsimile:    (202) 434-5029

Attorneys for Defendants and
Counterclaim-Plaintiff PFIZER INC.

Christopher H. McGrath (SBN 149129)
  chrismcgrath@paulhastings.com
**PAUL HASTINGS LLP**
695 Town Center Drive, 17th Floor
Costa Mesa, CA 92626
Telephone: (714) 668-6200
Facsimile: (714) 979-1921

Bruce M. Wexler, Esq.*
  brucewexler@paulhastings.com
Eric W. Dittmann, Esq.*
  ericdittmann@paulhastings.com
Scott F. Peachman, Esq.*
  scottpeachman@paulhastings.com
Mi Zhou, Esq.*
  mizhou@paulhastings.com
**PAUL HASTINGS LLP**
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

Attorneys for Defendants and
Counterclaim-Plaintiffs BIONTECH
SE, AND BIONTECH
MANUFACTURING GMBH

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROMOSOME LLC, | Case No.: 3:23-CV-01048-JES-MMP |
| Plaintiff, | |
| v. | **DEFENDANTS/COUNTERCLAIM-PLAINTIFFS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO PLAINTIFF/COUNTERCLAIM-DEFENDANT PROMOSOME LLC'S COMPLAINT** |
| PFIZER INC., BIONTECH SE, and BIONTECH MANUFACTURING GMBH, | |
| Defendants. | |

{02446246}

NOONAN LANCE BOYER & BANACH LLP

|  |  |  |
|---|---|---|
| PFIZER INC., BIONTECH SE, and BIONTECH MANUFACTURING GMBH, | Judge: | Hon. James E. Simmons, Jr. |
| | Ctrm: | 4B |
| | Magistrate: | Hon. Michaelle M. Pettit |
| Counterclaim-Plaintiffs. | Ctrm: | TBD |
| v. | Date Filed: | June 6, 2023 |
| PROMOSOME LLC, | | |
| Counterclaim-Defendant, | | |

Defendants and Counterclaim-Plaintiffs Pfizer Inc. ("Pfizer"), BioNTech SE and BioNTech Manufacturing GmbH (together, "BioNTech") answer and respond to each of the allegations in the complaint of Plaintiff and Counterclaim-Defendant Promosome LLC. Any allegations not expressly admitted are denied. This answer follows the numbering provided in Promosome's complaint. To the extent that the section headings of Promosome's complaint contain allegations, those allegations are denied. Promosome's complaint contains various footnoted citations not reproduced herein. To the extent Promosome's footnotes contain allegations, those allegations are denied. Promosome's complaint contains various images and figures. To the extent Promosome's images and figures contain allegations, those allegations are denied.

## INTRODUCTION & NATURE OF THE ACTION

**1.     Promosome is a biotechnology firm created to develop and commercialize the scientific advancements of Nobel laureate Gerald Edelman and Vincent Mauro, both of whom researched at The Scripps Research Institute ("Scripps"). Dr. Edelman was and Dr. Mauro is a pioneer in the field of biochemistry, discovering numerous concepts underlying ribonucleic acid ("RNA") therapeutics and vaccines, including those behind the messenger RNA ("mRNA") vaccines recently developed to combat the COVID-19 pandemic. One**

of their most significant contributions is a patented method for increasing mRNA protein expression, which is protected by U.S. Patent No. 8,853,179 (the "'179 Patent"). Dr. Mauro and his colleagues at Promosome—the exclusive licensee of the '179 Patent—disclosed the patented technology to Dr. Katalin Karikó, at that time one of BioNTech's leading mRNA scientists and its Senior Vice President.  But BioNTech and Pfizer never attempted to obtain a license. Years later, Defendants developed a COVID-19 vaccine generating tens-of-billions in revenues for the companies. And the sequence underlying Defendants' COVID-19 vaccine tells a clear story: Defendants used the method of the '179 Patent in their COVID-19 vaccine. This Complaint arises from Defendants' willful and unlawful infringement of the '179 Patent.

**ANSWER:**  Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the allegations in the first two sentences of Paragraph 1, and therefore deny them.  Pfizer and BioNTech deny the allegations in the third sentence, including that the claimed patent is a "significant contribution," because, *inter alia*, the '179 Patent does not claim any new or novel subject matter that was not publicly known at the time.  Pfizer and BioNTech admit that Dr. Katalin Karikó is considered a leading scientist in the mRNA field and was a Senior Vice President of BioNTech SE, but lack information and knowledge sufficient to form a belief as to the truth of the remaining allegations involving Dr. Karikó and so deny the same.  Pfizer and BioNTech admit that Pfizer and BioNTech have not sought a license for the '179 Patent, but deny any allegation that they were required to or should have done so.  Pfizer and BioNTech admit that they developed a COVID-19 vaccine and have realized revenue from doing so, but deny that they used the method of the '179 Patent in their vaccine.  The allegation in the final sentence of Paragraph 1 purports to characterize Promosome's complaint, which contains the allegations made and sets forth legal conclusions to which no response is required.  To the extent a response is required, Pfizer and BioNTech deny that the '179 Patent is valid, enforceable, or infringed, or that any alleged infringement was willful.

**2.**  **mRNA is genetic material that instructs the body how to produce proteins. It has numerous applications, one of which is mRNA vaccines. The**

NOONAN LANCE BOYER & BANACH LLP

3

**virus causing COVID-19, Severe Acute Respiratory Syndrome Coronavirus 2, or SARS-CoV-2, is a novel coronavirus, which is a type of virus known for its distinctive, crown-like spike proteins. Its genome is composed of RNA instead of DNA.  Coronaviruses are ideal candidates for mRNA vaccines because cells in the body can be instructed to create the coronavirus's unique spike protein, which itself contains no virus. The body's natural immune system will then recognize the newly minted spike protein as foreign and attack it. And that learned defense will prepare the immune system to fight the actual virus in the future.**

**ANSWER:** This paragraph contains vague and argumentative mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 2.

**3. One challenge facing mRNA vaccines is enabling cells to produce enough of the desired protein while administering acceptably small dosages of mRNA. To do that, the amount of protein generated per unit of mRNA must be increased. In and around 2009, Dr. Edelman, Dr. Mauro, and two colleagues named Stephen A. Chappell and Wei Zhou (collectively, the "Promosome Scientists") discovered a method for increasing protein expression by making small changes to the mRNA that could affect the amount of protein produced without altering the amino acid sequence encoded by the mRNA. (Amino acids are the building blocks of proteins.) This is possible because different mRNA sequences can encode the same amino acids while having different secondary effects.**

**ANSWER:** Pfizer and BioNTech deny that the Promosome Scientists "discovered" a method for increasing protein expression by mutating mRNA codons. This paragraph contains vague and argumentative mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 3.

**4. Underlying their innovation, the Promosome Scientists developed a novel understanding of how ribosomes—components of a cell that translate mRNA into the amino acid sequences that make up proteins—select a start site along the mRNA to begin their work. Start sites are typically denoted by certain sequences within the mRNA, most commonly the AUG codon. The scientists posited that ribosomes, instead of simply scanning along mRNA to find the first start sequence, used tethering or clustering mechanisms to find start sites based**

NOONAN LANCE BOYER & BANACH LLP

4

Case No. 3:23-CV-01048-JES-MMP

{02446246}

on other criteria, including relative accessibility. These mechanisms would cause ribosomes to sometimes start downstream of the actual, authentic start site, which would not only cause the ribosomes to fail to produce the desired protein, but potentially also to create novel and dangerous cryptic peptides.

ANSWER: Pfizer and BioNTech deny the allegations in Paragraph 4.

5. To solve this problem, the Promosome Scientists discovered a method for modifying mRNA to remove alternative or secondary start sites, and thus avoid competition between potential start sites, effectively directing more ribosomes to the authentic start site by reducing the unproductive diversion of ribosomes by the alternative start sites. Doing so accomplishes numerous goals, including reducing the number of potentially toxic peptides generated by the modified mRNA and, most significantly, increasing the expression of the desired protein encoded by the mRNA. As described above, sufficient expression of the desired protein is necessary for creating safe and beneficial mRNA vaccines.

ANSWER: This paragraph contains vague and argumentative mischaracterizations of scientific terms or principles. Pfizer and BioNTech therefore deny the allegations in Paragraph 5, including that the Promosome Scientists "discovered" the claimed method.

6. On February 24, 2009, the Promosome Scientists filed provisional patent application No. 61/155,049, entitled "Re-engineering mRNA primary structure for enhanced protein production." Shortly thereafter, the Promosome Scientists assigned the application to Scripps, and Scripps granted an exclusive, worldwide license to Promosome for all patents deriving from the February 2009 application, including the '179 Patent, which issued in 2014.

ANSWER: Pfizer and BioNTech admit that on February 24, 2009, a U.S. Provisional Patent Application No. 61/155,049 was filed that lists Stephen Chappell, Gerald Edelman, Vincent Mauro, and Wei Zhou as inventors. Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 6, and therefore deny the same.

7. Promosome then brought the method described in the '179 Patent to market, engaging in both primary research and development activities and pursuing partnerships with others in the field. Promosome marketed the practice of the '179 Patent under the trade name RESCUE™. Promosome recognized that BioNTech was a significant potential licensing or business

NOONAN LANCE BOYER & BANACH LLP

partner with respect to its RESCUE™ technology and the '179 Patent. In 2015, upon information and belief, Promosome's President John Manzello spoke with Dr. Katalin Karikó and provided her with a slide deck describing RESCUE™. Soon thereafter, on December 21, 2015, Dr. Mauro spoke with Dr. Karikó on the phone. Dr. Karikó told Dr. Mauro that she had already reviewed the slides prior to the meeting. She particularly told Dr. Mauro that she had spent all weekend considering a publication highlighted on one of the slides supporting the danger of a common approach to mRNA called codon optimization. The method of the '179 Patent could help mitigate that problem.

**ANSWER:** Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 7, and therefore deny the same.

**8.** Months later, in April 2016, Dr. Karikó inquired further of Dr. Mauro, specifically asking whether the RESCUE™ approach of the '179 Patent could be employed to increase protein expression in human T-cells. After Dr. Mauro responded, Dr. Karikó informed Promosome that she was waiting to see whether partners in the human T-cell area were interested in RESCUE™. Upon information and belief, BioNTech never again followed up with Promosome.

**ANSWER:** Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 8, and therefore deny the same.

**9.** Upon information and belief, BioNTech never reengaged Promosome to license its intellectual property, including as relevant here the rights to practice the method of the '179 Patent. That did not stop Defendants, however, from doing so. Defendants have described how they "developed their vaccine by utilizing innovation from their respective scientists and *relying upon decades of research conducted by others before the pandemic began*." Upon information and belief, the unnamed "others" include Drs. Edelman and Mauro and the research underlying the method of the '179 Patent. Indeed, Defendants have incorporated the method of the '179 Patent into the COVID-19 vaccine that they now market under the name Comirnaty®, which includes an mRNA sequence termed BNT162b2.

**ANSWER:** Pfizer and BioNTech admit that BioNTech has not entered into a license with Promosome, but deny that BioNTech needed to or should have done so.

6

NOONAN LANCE BOYER & BANACH LLP

1  Pfizer and BioNTech admit that they developed their vaccine by utilizing innovation

2  from their respective scientists and relying upon decades of research conducted by

3  others before the pandemic began, but deny the remaining allegations in Paragraph 9.

4  **10.     Defendants' vaccine sequence is now public. For example, in March**

5  **2021, scientists at Stanford published the results of their sequencing of**
   **Defendants' COVID-19 vaccine.** *See* **Jeong et al.,** *Assemblies of Putative SARS-*

6  *CoV2-Spike-Encoding* **mRNA** *Sequences for Vaccines BNT-162b2 and mRNA-*

7  **1273, available at https://virological.org/t/assemblies-of-putative-sars-cov2-**
   **spike-encoding-mrnasequences-for-vaccines-bnt-162b2-and-mrna-1273/663**

8  **(last visited June 5, 2023). Defendants' mRNA sequence starkly reveals they have**
   **modified their mRNA sequence to alter secondary initiation codons without**

9  **changing the underlying amino acid sequence encoded by the mRNA—the**

10 **method of the '179 Patent.**

11 **ANSWER:**   Pfizer and BioNTech admit that the cited source purports to

12 contain the results of the authors' sequencing of Defendants' Comirnaty® vaccine,

13 and that the source speaks for itself.   Pfizer and BioNTech deny the remaining

14 allegations in Paragraph 10.

15 **11.     Promosome applauds Defendants' efforts to develop and sell a**

16 **COVID-19 vaccine. Those efforts have saved innumerable lives. And the**
   **COVID-19 vaccines have accelerated and demonstrated the promise of mRNA**

17 **therapeutics and vaccines unlocked by Promosome's patented method. But it is**

18 **now clear that Defendants incorporated the method of the '179 Patent into their**
   **COVID-19 vaccine without appropriately compensating Promosome for the**

19 **right to do so. Promosome is and was a small biotech innovator. And Pfizer's**

20 **CEO Dr. Albert Bourla has made clear that patents are crucial to "small biotech**
   **innovators that are totally dependent on accessing capital from investors who**

21 **invest only on the premise that their intellectual property will be protected."**

22 **Upon information and belief, that vaccine alone has now generated for**
   **Defendants more than $75 billion in revenues. Promosome files this Complaint**

23 **to receive its rightful share of the tens-of-billions in revenues Defendants already**

24 **have earned and countless billions they will continue to earn by willfully**
   **infringing the '179 Patent.**

25

26 **ANSWER:**  Pfizer and BioNTech lack knowledge and information sufficient

27 to form a belief as to the truth of whether Promosome applauds Defendants' efforts

28 to develop and sell a COVID-19 vaccine, but admit that their efforts to develop and

NOONAN LANCE BOYER & BANACH LLP

7

sell a COVID-19 vaccine have saved innumerable lives. Pfizer admits that financial statements incorporated into Pfizer's SEC Form 10-K for the year ended December 31, 2022 reports global revenues associated with Comirnaty® as $37,806 and $36,781 million in 2022 and 2021, respectively.  To the extent the allegations in Paragraph 11 are inconsistent with Pfizer's filing, Pfizer and BioNTech deny them. The fifth sentence of Paragraph 11 purports to partially quote a letter from Dr. Albert Bourla that is not about this litigation and which speaks for itself.  Pfizer and BioNTech deny that they infringed the '179 Patent, that they did so willingly, that the patent is valid and enforceable, or that Plaintiff is entitled to any recovery whatsoever. Pfizer and BioNTech deny any remaining allegations in Paragraph 11.

## **PARTIES**

**12.    Plaintiff Promosome is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 48 Gurley Road, Stamford, CT 06902. Promosome is the exclusive licensee holding all substantial rights to the '179 Patent.**

**ANSWER:**  Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 12 and therefore deny them.

**13.    Upon information and belief, Pfizer is a corporation organized and existing under the laws of Delaware, with its principal place of business at 235 East 42nd Street, New York, NY 10017.**

**ANSWER:**  Pfizer admits that Pfizer is a corporation organized and existing under the laws of Delaware, but deny the remaining allegation in Paragraph 13. Pfizer's principal place of business is 66 Hudson Boulevard East, New York, New York 10001. BioNTech lacks information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 13 and therefore denies them.

**14.    Upon information and belief, BioNTech SE is a company organized and existing under the laws of Germany, with its principal place of business at An der Goldgrube 12, Mainz, 55131 Germany.**

NOONAN LANCE BOYER & BANACH LLP

**ANSWER:** BioNTech admits the allegations in Paragraph 14. Pfizer lacks information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 14 and therefore denies them.

**15.    Upon information and belief, BioNTech Manufacturing GmbH, a wholly-owned subsidiary of BioNTech SE, is a company organized and existing under the laws of Germany, with its principal place of business at An der Goldgrube 12, Mainz, 55131 Germany. BioNTech Manufacturing GmbH is the Biologics License Application ("BLA") holder for Comirnaty® in the United States.**

**ANSWER:** BioNTech admits the allegations in Paragraph 15. Pfizer lacks information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 15 and therefore denies them.

**16.    Upon information and belief, Pfizer and BioNTech together developed and commercialize Comirnaty®. In particular, Pfizer and BioNTech are and have been operating jointly and as agents of one another as to Defendants' vaccine, including by sharing the profits from the vaccine. For example:**

- **In a March 17, 2020, Collaboration Agreement Pfizer and BioNTech agree to undertake "collaborative research and development" to develop and launch a Covid-19 vaccine "in all countries of the Territory," where they "wish that Pfizer Commercialize[] the Product in all countries of the Territory," where (i) "Commercialize" is defined as "market, promote, distribute, offer for sale, sell, have sold, import, have imported, export, have exported or otherwise commercialize a compound or product," and (ii) "Territory" is defined to include the United States and the rest of the World except the People's Republic of China (including Hong Kong SAR and Macau SAR) and Taiwan.**

- **In a July 25, 2022, Complaint, Pfizer and BioNTech alleged that they "partnered together, and continue to work together" on the vaccine; "partnered together to develop, manufacture, and secure regulatory approval" of the vaccine, including as to "clinical testing [and] distribution"; and "agreed to share the costs of developing" the vaccine.**

**ANSWER:** Pfizer and BioNTech admit the allegations in the first sentence of Paragraph 16. The second sentence sets forth legal conclusions, to which no response

NOONAN LANCE BOYER & BANACH LLP

9

is required.  To the extent a response is required, Pfizer and BioNTech deny the allegation.  The remainder of Paragraph 16 characterizes documents that speak for themselves.  Pfizer and BioNTech deny any remaining allegations in Paragraph 16.

## JURISDICTION & VENUE

**17.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.**

**ANSWER:**  The allegations in Paragraph 17 set forth legal conclusions, to which no response is required.  To the extent a response is required, Pfizer and BioNTech deny that they have infringed the '179 Patent, or that the patent is valid or enforceable.

**18.   This Court has personal jurisdiction over Defendants. Defendants regularly conduct business within this District. Pfizer has a significant business presence in this District and employs many persons in it. On information and belief, those employees contribute to vaccine development, including Comirnaty® and its bivalent versions. Pfizer and each BioNTech defendant have specifically directed their business activities to selling and inducing persons to use Comirnaty® and its bivalent versions in this District, knowing and intending Comirnaty® and its bivalent versions would be used in this District and expecting their infringing actions to have consequences in this District, and have derived substantial revenue from the sale and use of Comirnaty® and its bivalent versions in this District. Pfizer and each BioNTech defendant have purposefully availed themselves of the benefits and protections of this District. There is nothing unfair about haling Pfizer and BioNTech into courts in this District.**

**ANSWER:**  The allegations in Paragraph 18 set forth legal conclusions, to which no response is required.  To the extent a response is required, Pfizer and BioNTech deny that personal jurisdiction is proper in this District.  Pfizer admits that Pfizer conducts business in this District and that Pfizer employs persons in this District, but denies that any of those persons contributed to the development of Comirnaty®.  Pfizer and BioNTech deny that any "infringing actions" have taken place in this District (or at all), or have had consequences in this District.  Pfizer and

NOONAN LANCE BOYER & BANACH LLP

{02446246}

BioNTech deny any remaining allegations in Paragraph 18.

**19.   Venue is proper in this District against Pfizer under 28 U.S.C. § 1400(b) because it has regular and established places of business herein and has committed acts of infringement herein. For example, on information and belief, Pfizer has a La Jolla Campus with multiple buildings in this District from which it engages in regular and established business, including but not limited to "CB1" located at 10777 Science Center Drive, San Diego, CA 92121 and other buildings that are part of the La Jolla Campus, including others on Science Center Drive.**

**ANSWER:**  The allegations in Paragraph 19 set forth legal conclusions to which no response is required.  To the extent a response is required, Pfizer admits Pfizer has a facility located at 10777 Science Center Drive, San Diego, CA 92121. Pfizer and BioNTech deny they have committed any "acts of infringement" and deny any remaining allegations in Paragraph 19.

**20.   Pfizer also has committed acts of infringement in this District, including but not limited to selling, using, and offering to sell its COVID-19 vaccines, which are products made by the patented process, within this District in violation of 35 U.S.C. § 271(g). Further, Pfizer actively induces others to use its COVID-19 vaccines in this District, in violation of 35 U.S.C. § 271(b), including through advertising and promotion of its COVID-19 vaccines to persons and medical providers in this District.**

**ANSWER:**  The allegations in Paragraph 20 set forth legal conclusions to which no response is required.  To the extent a response is required, Pfizer and BioNTech deny they have committed any "acts of infringement" and deny any remaining allegations in Paragraph 20.

**21.   Venue is proper in this District against BioNTech SE and BioNTech Manufacturing GmbH, *inter alia*, under 28 U.S.C. § 1391(c)(3) because they are foreign entities.**

**ANSWER:**  The allegations in Paragraph 21 set forth legal conclusions to which no response is required.

NOONAN LANCE BOYER & BANACH LLP

{02446246}

11

**BACKGROUND**

A.    **mRNA Vaccines**

**22.    This lawsuit centers on Defendants' vaccine meant to prevent and lessen the severity of COVID-19, the disease caused by the SARS-CoV-2 virus. SARS-CoV-2 is a coronavirus, which is a group of RNA viruses known for their distinctive, crown-like surface projections called spike proteins. Viruses like SARS-CoV-2 appropriate a host cell's cellular machinery and instruct the host cell to create additional copies of the virus, which can then spread the infection. In the process, the host cells can be damaged or destroyed, harming and possibly even killing the host organism.**

**ANSWER:**  The allegation in the first sentence of Paragraph 22 purports to characterize Promosome's complaint, which contains the allegations made and sets forth legal conclusions to which no response is required.  This paragraph contains vague and argumentative mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 22.

**23.    Vaccines targeting viruses train the human body to recognize and attack viruses before the virus infects the vaccine recipient. Historically, vaccines consisted of weakened or inactive virus that was unlikely to cause infection yet sufficient to provoke an immune response. mRNA vaccines, however, generally function differently. These vaccines prompt the body to express proteins with sufficient similarity to certain features of the virus to provoke a natural immune response that would also be effective in recognizing and attacking the virus itself. In the case of SARS-CoV-2, mRNA vaccines like Defendants' cause the body to create a protein like the virus's distinctive spike protein, which itself contains no virus. The body's efforts to attack the mimicked spike proteins train the body to recognize the spike protein of the SARS-CoV-2 virus and thus provoke an immune response to the virus itself.**

**ANSWER:**    This paragraph contains vague and argumentative mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 23.

**24.    mRNA vaccines historically held great promise but had not yet been commercialized until the COVID-19 pandemic. In part, this traced to various technological challenges facing mRNA vaccines. One significant challenge was creating synthetic mRNA that would cause the body to express enough of the**

NOONAN LANCE BOYER & BANACH LLP

12

**Case No. 3:23-CV-01048-JES-MMP**

desired protein per unit of mRNA. **The amount of protein expressed per mRNA is known as efficiency. Efficient protein synthesis allows sufficient therapeutic benefit with tolerable dosages of mRNA. Otherwise, such a large amount of mRNA would have to be administered that, among other things, there would be a potentially dangerous level of unwanted cryptic peptides produced and cells could be overwhelmed by the surge of mRNA. The patented method underlying this suit increases protein expression by affecting the process of protein synthesis.**

**ANSWER:**     This     paragraph     contains     vague     and     argumentative mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 24.  Pfizer and BioNTech further deny that the '179 Patent is valid or enforceable, or that they infringed on the patented method in creating the Comirnaty® vaccine.

**B.     Protein Expression and mRNA Translation**

**25.     Proteins perform most of the functions in the human body and are necessary to human existence. Protein synthesis is the cellular process for expressing proteins. Humans retain instructions for certain proteins through nucleic acids, which are molecules that encode genetic information. Deoxyribonucleic acid, or DNA, is a type of nucleic acid found in human chromosomes. Protein synthesis generally begins when the cell creates mRNA from DNA through a process called transcription. A similar process can be used outside of the body to manufacture mRNA with desired properties.**

**ANSWER:**     This     paragraph     contains     vague     and     argumentative mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 25.

**26.     The process of producing proteins from mRNA is called translation, which is the focus of the '179 Patent. mRNA is a linear template composed of 4 nucleosides: guanosine (G), uridine (U), adenosine (A), and cytidine (C), each of which has a nitrogen-containing ring structure linked to a ribose sugar. Individual nucleosides are linked together by phosphate bonds between the ribose sugars (nucleosides with a phosphate group are called nucleotides). Phosphate bonds join the 5' carbon of one ribose sugar to the 3' carbon of another. By convention, 5' to 3' is used to indicate the directionality of mRNA (indicated schematically as left to right). Relevant to this discussion are a few mRNA components, including the 5′ untranslated region ("UTR")—often called**

NOONAN LANCE BOYER & BANACH LLP

the 5′ leader because it comes near the start (5' end) of the mRNA—followed by the coding sequence, and then the 3′ UTR.  The coding sequence describes various amino acids, ordered in the 5′ to 3′ direction, that form the encoded protein. Each amino acid is encoded by 3 nucleotides called a trinucleotide codon. There are 64 (43) different trinucleotide codons, which collectively encode for the 20 amino acids in human proteins. For instance, the codon GCU—that is, a triplet of guanosine, cytidine, and uridine in that order—encodes the amino acid alanine. While two amino acids are encoded by only a single codon, the other 18 are encoded by 2, 3, 4, or 6 synonymous codons. As a result, an effectively infinite variety of mRNA sequences could encode any given amino acid sequence.

**ANSWER:** This paragraph contains vague and argumentative mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 26.  Pfizer and BioNTech further deny that the '179 Patent is valid or enforceable, or that they infringed the patented method in creating the Comirnaty® vaccine.

**27.    Ribosomes translate an mRNA's coding sequence into amino acid chains called polypeptides that form proteins. As shown below, translation has three steps: initiation, elongation, and termination.**

**ANSWER:** This paragraph contains vague and argumentative mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 27.

**28.    The first step, initiation, is the focus of the Promosome's patented method and involves the processes that lead to the formation of a eukaryotic ribosome at the translation start site. These processes include (i) recruitment of a eukaryotic small ribosomal subunit (the "40S ribosomal subunit") to the mRNA and (ii) start site selection, where the 40S ribosomal subunit moves to an initiation codon and joins with the eukaryotic large ribosomal subunit (the "60S ribosomal subunit") to form a eukaryotic ribosome, called an 80S ribosome.6 Start sites are denoted by certain codons called initiation codons. The most common initiation codon is AUG, but there are other noncanonical initiation codons including CUG, ACG, GUG, UUG, AUA, AUC, and AUU. The initiation codon at the start of the coding sequence is called the primary initiation codon. The primary initiation codon is the authentic start site for translation of the desired amino acid sequence.**

**ANSWER:** This paragraph contains vague and argumentative

NOONAN LANCE BOYER & BANACH LLP

{02446246}

mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 28.  Pfizer and BioNTech further deny that the '179 Patent is valid or enforceable, or that they infringed the patented method in creating the Comirnaty® vaccine.

**29.     Potential start sites downstream of the primary initiation codon (*i.e.*, within the coding sequence) are called secondary initiation codons. These alternate start sites can either be in the same reading frame as the coding sequence (in-frame) or in a different reading frame that groups nucleotides in different sets of three (out-of-frame). An in-frame codon encodes an amino acid as part of the intended reading frame of the coding sequence—in other words, the grouping of nucleotides into triplets that occurs when translation begins with the primary initiation codon. Because all start codons also encode an amino acid, these codons can be mistaken for a start site when existing simply to encode an amino acid somewhere downstream of the authentic start site. For instance, AUG is the most prevalent start site but also the only codon for the amino acid methionine, so can serve as a secondary initiation codon when encoding methionine.**

**ANSWER:**     This     paragraph     contains     vague     and     argumentative mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 29.

**30.     An out-of-frame initiation codon, by contrast, is a codon formed by reading parts of consecutive codons within the authentic reading frame. Consider, for example, a short mRNA sequence for the amino acid histidine followed by valine, which could be encoded by a CAU codon (in bold) followed by a GUU codon (in italics): C A U *G U U*. This sequence would create an out-of-frame initiation codon AUG by reading the middle adenosine (A) and final uridine (U) in the CAU codon along with the initial guanosine (G) in the GUU codon, as underlined here: C A̲ U̲ *G̲ U U*.**

**ANSWER:**     This     paragraph     contains     vague     and     argumentative mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 30.

**31.     To express the desired protein, the authentic, primary initiation codon must be used as the ribosomal start site. As shown below, however, the 40S ribosomal subunit can instead be attracted to downstream in-frame or out-**

**of-frame secondary initiation codons. This is known as ribosomal diversion. Ribosomal diversion prevents the affected ribosome from creating the desired protein and potentially causes the creation of novel or dangerous polypeptides.**

**ANSWER:** This paragraph contains vague and argumentative mischaracterizations of scientific terms or principles. Pfizer and BioNTech therefore deny the allegations in Paragraph 31.

**32.    The second and third steps of the translation process follow naturally from initiation. In the second step, elongation, the 80S ribosome travels along the mRNA translating one codon at a time and linking the encoded amino acids into polypeptides as it goes. The elongation process continues as the 80S ribosome travels towards the 3′ UTR until the third step, termination. Termination is the conclusion of the translation process and occurs when the 80S ribosome reaches a stop codon. The three stop codons—UAA, UAG, and UGA— do not encode any amino acid. During translation, co-translational processes, including folding, may occur. Upon termination, the polypeptide chain may undergo other post-translational modifications to form a protein and complete protein synthesis.**

**ANSWER:** This paragraph contains vague and argumentative mischaracterizations of scientific terms or principles. Pfizer and BioNTech therefore deny the allegations in Paragraph 32.

C.    **Promosome Scientists Discover a Method of Improving Protein Expression Efficiency**

**33.    As described above, mRNA vaccines take advantage of the translation process by introducing synthetic mRNA into the body so that human cells produce the desired protein. For mRNA vaccines to provide sufficient therapeutic benefits at reasonable dosages, the constituent mRNA must be highly efficient at protein synthesis. In other words, it must prompt the body to maximize the production of the desired protein per unit of mRNA introduced into the body.**

**ANSWER:** This paragraph contains vague and argumentative mischaracterizations of scientific terms or principles. Pfizer and BioNTech therefore deny the allegations in Paragraph 33.

NOONAN LANCE BOYER & BANACH LLP

{02446246}

34.     **Protein expression efficiency relates to the sequence of the underlying mRNA. As described above, because most amino acids can be encoded by one of several synonymous codons, a near infinite variety of mRNA sequences can cause the body to create the same polypeptide chain needed for a given protein. But the different mRNA sequences will present varying levels of protein expression efficiency and other secondary characteristics. Early efforts to increase efficiency focused on codon optimization, which typically posits that 80S ribosomes translate certain synonymous codons more quickly than others. Codon optimization, then, often involves modifying mRNA by replacing certain codons with synonymous codons that encode the same amino acid—thus not changing the amino acid sequence in the resultant polypeptide—but that theoretically cause quicker translation. Similarly, optimization can attempt to reduce the amount of uridine (U) and cytidine (C) in the mRNA sequence to increase stability and reduce immune response against the mRNA itself.**

**ANSWER:**     This paragraph contains vague and argumentative mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 34.

35.     **Scientists at The Scripps Research Institute were long on the forefront of mRNA discovery. These scientists included: Gerald Edelman, who shared the 1972 Nobel Prize for Physiology or Medicine for his pioneering work studying the chemical structure of antibodies, and who worked as Scripps's Chairman of Neurobiology; Vincent Mauro, a global thought leader in mRNA translation who served at Scripps as an Associate Professor of Cell and Molecular Biology; and Wei Zhou & Stephen Chappell, Scientists at Scripps and eventually Promosome. Each of these scientists, referred to as the Promosome Scientists, was affiliated with Promosome.**

**ANSWER:**  Pfizer and BioNTech lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 35, and therefore deny the same.

36.     **The Promosome Scientists developed an advanced understanding of the translation process and, in particular, the recruitment and start site selection processes involved in initiation. Prior to their discovery, scientists and prior art generally followed a scanning model of translation initiation, where the 40S ribosomal subunit scanned across the mRNA from the 5′ leader in the direction of the 3′ UTR until an initiation codon was identified. The Promosome Scientists discovered and hypothesized that that 40S ribosomal subunits likely used other**

NOONAN LANCE BOYER & BANACH LLP

{02446246}

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NOONAN LANCE BOYER & BANACH LLP

**mechanisms for start-site selection, including tethering or clustering mechanisms. At a high level, ribosomal tethering describes a mechanism in which ribosomal subunits reach the initiation codon while bound to a fixed point in the mRNA. With tethering, the intervening sequences are not scanned, but are bypassed when the ribosomal subunit pairs to the initiation codon. Ribosomal clustering, by contrast, is a dynamic process that involves reversible binding of the ribosomal subunit to and detachment from various sites in the mRNA and that does not require that the ribosomal subunit be tethered to the mRNA for it to reach the initiation codon.**

**ANSWER:** Pfizer and BioNTech deny that the Promosome Scientists "discovered" new methods of start-site selection that were unknown to "scientists and prior art generally." Pfizer and BioNTech deny the remaining allegations in Paragraph 36.

**37.    The particulars of these mechanisms are beyond the scope of this Complaint, but the thrust of these alternate mechanisms then-hypothesized by the Promosome Scientists is that there would be a likelihood that translation would initiate at secondary initiation codons, including out-of-frame secondary initiation codons, rather than the authentic or primary initiation codon. In other words, the secondary initiation codons effectively competed with the primary initiation codon in the ribosomal recruitment process, increasing ribosomal diversion and reducing the number of ribosomes starting at the authentic start site. 80S ribosomes initiating translation at secondary initiation codons would nonetheless work from the wrong starting place to translate incorrect (*i.e.*, out of sync with the proper reading frames) or incomplete (*i.e.*, starting mid-sequence) polypeptides that cannot result in the desired protein. The consequences of binding to a secondary initiation codon, then, would include reduced expression of the full-length protein and the potential creation of dangerous cryptic peptides. The latter consequence would be exacerbated by codon optimization, because while substituting synonymous codons preserves the intended codon sequence of the primary reading frame, it completely changes out-of-frame codons read when elongation begins at out-of-frame secondary initiation codons. This means that codon optimization can cause the body to produce novel cryptic peptides.**

**ANSWER:** Pfizer and BioNTech deny that the Promosome Scientists "hypothesized" new methods of start-site selection that were unknown to people learned in the art at the time. Indeed, as explained in the Counterclaim paragraphs, the Promosome Scientists cited others for this alleged insight. Pfizer and BioNTech

18

**Case No. 3:23-CV-01048-JES-MMP**

1   deny the remaining allegations in Paragraph 37.

2      **38.    Building from their fundamental insights regarding the translation**
3   **process, the Promosome Scientists discovered a method for increasing full-length**
4   **protein expression efficiency that would help unlock the promise of mRNA**
5   **therapeutics and vaccines. In particular, they discovered that mRNA or other**
6   **polynucleotides could be modified to reduce the impact of one or more secondary**
7   **initiation codons or to eliminate one or more such codons altogether. Like codon**
8   **optimization, one embodiment of this novel method took advantage of**
9   **synonymous codons that could replace existing codons to disrupt secondary**
10  **initiation sites without altering the corresponding amino acid sequence.**

     **ANSWER:**  Pfizer and BioNTech deny that the Promosome Scientists had
"insights" about translation or "discovered a method" for increasing expression
efficiency that were unknown to people learned in the art at the time.  Indeed, as
explained in the Counterclaim paragraphs, the Promosome Scientists cited others for
this alleged insight.  Pfizer and BioNTech deny the remaining allegations in Paragraph
38.

     **39.    To illustrate, recall from above the short mRNA sequence encoding**
**the amino acids histidine then valine with a CAU codon (in bold) followed by a**
**GUU codon (in italics), but which presents an out-of-frame initiation codon AUG**
**(underlined): C A U G U U. Under the Promosome Scientists' innovative method,**
**for example, the first CAU codon could be modified to CAC by replacing the**
**uridine (U) with cytidine (C) to eliminate the out-of-frame initiation codon AUG**
**and replace it with the comparatively weak, noncanonical initiation codon ACG:**
**C A C G U U. Such a modification would not alter the resultant amino acid**
**sequence in the intended polypeptide because CAU and CAC both encode the**
**amino acid histidine. But it would be likely to reduce ribosomal diversion and**
**thus cause more ribosomes to translate the desired amino acid sequence by**
**starting at the primary initiation codon. Other codons permit complete**
**elimination of the secondary initiation site even for in-frame initiation codons.**
**For instance, the secondary initiation codon CUG, which encodes Leucine, can be**
**mutated to CUA, CUC, CUU, or UUA, all of which also encode Leucine but are**
**not known initiation codons.**

     **ANSWER:** Pfizer and BioNTech deny that the allegations in Paragraph 39
"illustrate" a patentable method or that the Promosome scientists discovered any
"innovative method."   This paragraph contains vague and argumentative

19

NOONAN LANCE BOYER & BANACH LLP

mischaracterizations of scientific terms or principles.  Pfizer and BioNTech therefore deny the allegations in Paragraph 39.

**40.    The below illustration shows how removing secondary initiation codons via modification—here, eliminating CUG, ACG, GUG, and ACG codons—can cause more ribosomes to initiate translation at the primary initiation codon and thus create more of the desired protein:**

**ANSWER:**    This    paragraph    contains    vague    and    argumentative mischaracterizations of scientific terms or principles, and Pfizer and BioNTech therefore deny the allegations in Paragraph 40.

**41.    In Figure 4, above, the blue proteins with an orange signal peptide represent the desired result of translation starting at the primary initiation codon. (A signal peptide is the amino acid chain encoded by the first portion of the coding sequence that labels a protein for secretion from the cell; it is cleaved off the mature protein.) Gray and green lines represent undesirable peptides generated from out-of-frame secondary initiation codons, and mis-sized blue lines represent undesirable peptides generated from in-frame secondary initiation codons. The illustration on the right shows how removing secondary initiation codons results in a greater protein expression efficiency of the desired protein as more ribosomes start at the primary initiation codon and thus translate the desired amino acid sequence. The same method can be applied to DNA to cause mRNA transcribed from the DNA to have the desired modifications.**

**ANSWER:**    This    paragraph    contains    vague    and    argumentative mischaracterizations of scientific terms or principles, and Pfizer and BioNTech therefore deny the allegations in Paragraph 41.

**42.    The Promosome Scientists engaged in testing, described in the '179 Patent and elsewhere, that confirmed the validity and usefulness of their method for increasing protein expression. In some instances, the method caused protein expression to increase by significant multiples. And time has only underscored the importance of their innovative approach to increasing protein expression efficiency, as (among other things) mRNA vaccines have now demonstrated their efficacy against COVID-19. Indeed, one of the key insights of the Promosome Scientists—that initiation often mistakenly occurs at downstream secondary initiation codons—is now widely accepted. To be sure, the method of the '179 Patent remains agnostic to the precise mechanism(s) used for translation initiation, and there remains significant scientific debate over the appropriate**

Noonan Lance Boyer & Banach LLP

**mechanism. But further study has only strengthened the critique of the linear scanning model questioned by the Promosome Scientists.**

**ANSWER:** Pfizer and BioNTech deny that the Promosome Scientists' methods here were "innovative" or that they had a novel, "key insight[]" that "initiation often mistakenly occurs at downstream secondary initiation codons." That alleged "insight" is reflected in prior art, including prior art the Promosome scientists cited in their publications. This paragraph also contains vague and argumentative mischaracterizations of scientific terms or principles. Pfizer and BioNTech therefore deny any remaining allegations in Paragraph 42.

**43.   Increased protein expression is essential to, among other things, the prospect of modern mRNA therapeutics and vaccines. mRNA vaccines like the COVID-19 vaccines, for instance, must cause sufficiently efficient protein synthesis so that they can be dosed safely. Otherwise, generating a sufficient immune response would require a much larger dose of mRNA. Larger doses would lead to increased production of cryptic peptides, which may negatively affect both overall expression levels and cell physiology (and, ultimately, human health). In addition, too large of doses of mRNA may in fact limit protein production, which would negatively affect other processes in the cells.**

**ANSWER:** This paragraph contains vague and argumentative mischaracterizations of scientific terms or principles. Pfizer and BioNTech therefore deny the allegations in Paragraph 43.

**D.   Promosome Scientists Protect Their Discovery with the '179 Patent**

**44.   Shortly after discovering their novel method for increasing protein expression, the Promosome Scientists timely sought legal protections for their discovery.**

**ANSWER:** Pfizer and BioNTech deny that the Promosome scientists "discover[ed]" a "novel method for increasing protein expression." The remainder of Paragraph 44 sets forth a legal conclusion to which no response is required. To the extent a response is required, Pfizer and BioNTech deny the remaining allegations in Paragraph 44.

NOONAN LANCE BOYER & BANACH LLP

21

{02446246}

**Case No. 3:23-CV-01048-JES-MMP**

**45.   On, February 24, 2009, they filed U.S. Provisional Patent Application No. 61/155,049. Exactly one year later, they filed a Patent Cooperation Treaty application No. PCT/US2010/000567. The U.S. Application resulted in publication of application No. 2012/005333 A1 on March 1, 2012. And an extensive catalogue of foreign patents also were obtained under the PCT application.**

**ANSWER:**  Pfizer and BioNTech admit that the cover page of the '179 Patent lists "Provisional application No. 61/155,049, filed on Feb. 24, 2009," "PCT No.: PCT/US2010/000567," "PCT Filed: Feb. 24, 2010," and "Prior Publication Data US 2012/0053333 A1 Mar. 1, 2012."   Pfizer and BioNTech deny any remaining allegations in Paragraph 45.

**46.   Relevant here, on October 7, 2014, the United States Patent and Trademark Office duly and legally issued the '179 Patent entitled "Reengineering mRNA Primary Structure for Enhanced Protein Production." A true and correct copy of the '179 Patent is attached as Exhibit 1 to this Complaint.**

**ANSWER:**  Pfizer and BioNTech admit that the U.S. Patent and Trademark Office issued the '179 Patent on October 7, 2014, but deny that the patent is valid and enforceable.   Pfizer and BioNTech admit that Exhibit 1 to Plaintiff's complaint is a document that purports to be a copy of the '179 Patent.   Pfizer and BioNTech deny any remaining allegations of Paragraph 46.

**47.   Claim 1 of the '179 Patent—the only claim in the patent—recites:**

**1.   A method of improving full-length protein expression efficiency comprising:**

**a)   providing a polynucleotide comprising:**
    **i)   a coding sequence for the full-length protein;**
    **ii)   a primary initiation codon that is upstream of the coding sequence of the full-length protein, said primary initiation codon encoding the first amino acid of the coding sequence of the full-length protein; and**
    **iii)   one or more secondary initiation codons located**

within the coding sequence of the full-length protein downstream of the primary initiation codon; and

b)   mutating the one or more secondary initiation codons located within the coding sequence of the full-length protein downstream of the primary initiation codon,

wherein the mutation results in a decrease in initiation of protein synthesis at the one or more secondary initiation codons, thereby increasing expression efficiency of the full-length protein initiated at the primary initiation codon,

wherein mutating the one or more secondary initiation codons located within the coding sequence of the full-length protein downstream of the primary initiation codon comprises mutating one or more nucleotides such that the amino acid sequence of the protein remains unaltered.

**ANSWER:** Pfizer and BioNTech admit that Paragraph 47 recites Claim 1 of the '179 Patent, but deny that the '179 Patent is valid, enforceable, or infringed.

### E.   Promosome Attempts to Commercialize the '179 Patent, Including to BioNTech

**48.   Promosome is a Delaware limited liability company that was incorporated in 2001 to develop and commercialize inventions from Nobel laureate Gerald Edelman and Vincent Mauro at Scripps, among others. Promosome worked closely with numerous scientists from Scripps. Promosome engaged in a series of two-year Research Funding & Option (RFO) agreements with Scripps specific to the laboratory operated by Drs. Edelman and Mauro. Their fundamental research on mechanisms of mRNA translation had clear applications for optimizing protein expression and purity in the burgeoning field of protein biotherapeutics. Promosome experienced significant growth. Indeed, Dr. Mauro left Scripps in 2014 to join Promosome as its Senior Vice President and Chief Scientific Officer.**

**ANSWER:** Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 48 and therefore deny

the same.

**49.     On June 25, 2009, shortly after the Promosome Scientists filed the provisional patent application related to the '179 Patent on February 24, 2009, Promosome obtained an exclusive, worldwide license to patents arising out of or resulting from that application, including the to-be-issued '179 Patent.**

**ANSWER:**  Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 49 and therefore deny the same.

**50.     Under its licensing agreement and amendments thereto, Promosome owns all substantial rights to the '179 Patent, including the right to assert all causes of action under the '179 Patent and the right to remedies obtained on the '179 Patent.**

**ANSWER:**  The allegation in Paragraph 50 sets forth a legal conclusion to which no response is required.  To the extent a response is required, Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the allegation in Paragraph 50 and therefore deny the same.

**51.     Promosome has standing to bring this cause of action in its own name.**

**ANSWER:**  The allegation in Paragraph 51 sets forth a legal conclusion to which no response is required.  To the extent a response is required, Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the allegation in Paragraph 51 and therefore deny the same.

**52.     Promosome sought to bring the method of the '179 Patent, along with expertise in its implementation, to market under the trade name RESCUE™. RESCUE™ was part of a robust and then-growing technology suite, including numerous patents and other technologies such as Positive Feedback Selection, Translation Enhancing Elements, and Landing Pad. Promosome actively sought to monetize its intellectual property through partnerships in fields like mammalian cell line development, mRNA therapeutics, and Coagulation Factors, as well as internal programs aimed at creating hard-to-express proteins and biosimilars.**

**ANSWER:**  Pfizer and BioNTech lack information and knowledge sufficient

to form a belief as to the truth of the allegations in Paragraph 52 and therefore deny the same.

**53.     In 2013, for example, the company had locations in New York City, New York and La Jolla, California. It had obtained between $10–12 million in research grants and raised $17 million in funding series A, B, and C. Around that time, it grew to about 15 employees led on the technical side by Drs. Edelman and Mauro and obtained ~10,000 square feet of class-A lab and office space in La Jolla.**

**ANSWER:**  Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 53 and therefore deny the same.

**54.     During this time period, Promosome recognized that BioNTech was a significant potential licensing or business partner with respect to its RESCUE™ technology and the '179 Patent. On information and belief, in 2015, Promosome's President John Manzello spoke with Dr. Katalin Karikó, then a Senior Vice President and leading scientist at BioNTech, and provided her with a slide deck that described RESCUE™. Dr. Karikó said that she was "very familiar with the outstanding work of Vincent Mauro" and that she had "studied the documents" given to her by Mr. Manzello. Soon thereafter, on December 21, 2015, Dr. Mauro spoke with Dr. Karikó on the phone. Dr. Karikó again told Dr. Mauro that she had already reviewed the slides prior to the meeting. She particularly told Dr. Mauro that she had spent all weekend considering a slide describing dangers of a common approach to mRNA called codon optimization. RESCUE™, the slide deck explained, could help mitigate that problem.**

**ANSWER:**  Pfizer and BioNTech admit that Dr. Katalin Karikó is considered a leading scientist in the mRNA field and was a Senior Vice President at BioNTech SE.  Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 54 and therefore deny the same.

**55.     Months later, in April 2016, Dr. Karikó inquired further of Dr. Mauro, specifically asking whether the RESCUE™ approach of the '179 Patent could be employed to increase protein expression in human T-cells. After Dr. Mauro responded, Dr. Karikó informed Promosome that she was waiting to see whether partners in the human T-cell area were interested in RESCUE™.**

25

**Upon information and belief, BioNTech never again followed up with Promosome.**

**ANSWER:** Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 55 and therefore deny the same.

**56.    Around this time, Promosome also had interactions with Pfizer, including in connection with Pfizer's partnership with non-party Spark Therapeutics for a different treatment. For example, upon information and belief, Mr. Manzello met with Paul Young, Executive Director and Head of Technologies for Pfizer's External Research & Development Innovation (ERDI) Group, at the 2015 Biotechnology Industry Organization International Convention. Upon information and belief, Mr. Manzello had follow-up communications with Dr. Young after this meeting.**

**ANSWER:** Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 56 and therefore deny the same.

**57.    By late 2016, however, funding became scarce and Promosome was forced to reduce the scope of its operations, including by closing its wet lab. This reduction was caused by a financial shortfall, which, in part, traced to the inability to develop a partnership in the mRNA therapeutics realm in which Defendants operate. Despite these reductions in scope, Promosome continues to pursue partnerships to develop and advance its intellectual property.**

**ANSWER:** Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 57 and therefore deny the same.

**F.    Defendants Develop and Market an Infringing COVID-19 Vaccine**

**58.    Upon information and belief, the genomic sequence for SARS-CoV-2 was published online by January 11, 2020. Shortly thereafter, BioNTech began working on an mRNA vaccine to combat the COVID-19 pandemic, which eventually took the name "Project Lightspeed." This development effort began with a number of potential vaccine candidates in the BNT162 family of mRNA sequences, of which the ultimate sequence BNT162b2 was a part.**

**ANSWER:** Pfizer and BioNTech admit the allegation in the first sentence of

26

Noonan Lance Boyer & Banach LLP

{02446246}

Paragraph 58.  Pfizer and BioNTech admit that by early January of 2020, BioNTech initiated "Project Lightspeed," an accelerated vaccine development program to fight COVID-19.  Pfizer and BioNTech admit that on July 27, 2020, BioNTech and Pfizer began a Phase 2/3 clinical study of their advanced nucleoside-modified messenger RNA candidate BNT162b2.   Pfizer and BioNTech deny the allegations in the remainder of Paragraph 58.

**59.   Upon information and belief, Pfizer and BioNTech executed a Material Transfer and Collaboration Agreement to co-develop a COVID-19 vaccine on or before March 17, 2020. Under that agreement, BioNTech's mRNA vaccine technology and expertise would be paired with Pfizer's development, regulatory, and commercial capabilities to develop and commercialize a COVID-19 vaccine.**

**ANSWER:**  Pfizer and BioNTech admit that they executed an agreement titled "Collaboration Agreement" on about March 17, 2020 to jointly develop a COVID-19 vaccine.   Pfizer and BioNTech admit that they also worked together to obtain regulatory approval for Comirnaty®.   Pfizer and BioNTech deny the remaining allegations in Paragraph 59.

**60.   Upon information and belief, Defendants imported into the United States complementary DNA ("cDNA") or plasmid DNA ("pDNA") encoding BNT162b2 created using the patented method in Germany. Pfizer then used that cDNA or pDNA as a seed for subsequent production of additional cDNA or pDNA and, ultimately, the manufacture of the mRNA used in Comirnaty®. In the alternative, Pfizer itself practiced the patented method to create cDNA or pDNA. The importation of BNT162b2 cDNA or pDNA and its replication occurred before any contract was signed for sales of BNT162b2 with the United States Government.**

**ANSWER:**  Pfizer and BioNTech deny that any cDNA or pDNA was "created using the patented method," and therefore deny the allegations in Paragraph 60.

**61.   cDNA or pDNA can be replicated. Upon information and belief, all cDNA or pDNA used for worldwide production of Comirnaty® is manufactured at a Pfizer plant in Chesterfield, Missouri or elsewhere in the United States. This is the first step in manufacturing the mRNA used in Comirnaty®. In the alternative, certain cDNA or pDNA used for worldwide production of**

27

NOONAN LANCE BOYER & BANACH LLP

Comirnaty® is manufactured in the United States and shipped to foreign countries.

**ANSWER:** Pfizer and BioNTech deny that any cDNA or pDNA was created using the patented method, and therefore deny the allegations in Paragraph 61.

**62.    Upon information and belief, Defendants use the cDNA or pDNA to manufacture mRNA drug substance in at least Andover, Massachusetts, Mainz, Germany, and Laupheim, Germany. Certain cDNA or pDNA manufactured in the United States is shipped internationally for further production of drug substance (*i.e.*, mRNA) in foreign countries.**

**ANSWER:** Pfizer and BioNTech deny that any cDNA or pDNA was created using the patented method.  Further, Paragraph 62 is vague and ambiguous, including as to the meaning of "drug substance."  Pfizer and BioNTech therefore deny the allegations in Paragraph 62.

**63.    Upon information and belief, drug substance is finished into drug product in Kalamazoo, Michigan or in locations in Europe, including Puurs, Belgium.**

**ANSWER:** Paragraph 63 is vague and ambiguous, including as to the meaning of "drug substance" and "drug product."  Pfizer and BioNTech therefore deny the allegations in Paragraph 63.

**64.    Upon information and belief, Defendants ship drug substance and drug product from the United States to other countries around the world, including Canada, Mexico, and Australia.**

**ANSWER:** Paragraph 64 is vague and ambiguous, including as to the meaning of "drug substance" and "drug product."  Pfizer and BioNTech therefore deny the allegations in Paragraph 64.

**65.    Upon information and belief, Defendants import drug product from Europe into the United States.**

**ANSWER:** Paragraph 64 is vague and ambiguous, including as to the meaning of "drug product."  Pfizer and BioNTech therefore deny the allegations in Paragraph 65.

28

66.     **Upon information and belief, on November 18, 2020, Pfizer and BioNTech announced that BNT162b2 showed 95% efficacy against the original coronavirus strain in study participants who had no prior SARS-CoV-2 infection. On December 11, 2020, the FDA granted emergency use authorization for the use of BNT162b2 in persons over 16 years of age. On August 23, 2021, the FDA approved the BLA for Comirnaty® (BNT162b2) for use in persons over 16 years of age. On July 8, 2022, the FDA approved the BLA for Comirnaty® (BNT162b2) for use in persons ages 12–15. Upon information and belief, BioNTech Manufacturing GmbH is the BLA holder for Comirnaty®.**

**ANSWER:** Pfizer and BioNTech admit the allegations in Paragraph 66.

67.     **Upon information and belief, on October 29, 2021, the FDA authorized the use of BNT162b2 in children between 5 and 11 years of age pursuant to an emergency use authorization. On June 17, 2022, that emergency use authorization was expanded to include the use of the vaccine in children between six months and 4 years of age.**

**ANSWER:** Pfizer and BioNTech admit the allegations in Paragraph 67.

68.     **Upon information and belief, on September 22, 2021, the FDA amended its emergency use authorization for Comirnaty® to permit administration of a booster dose in some persons six months after completing their primary two-dose series of Comirnaty®. On November 19, 2021, the FDA expanded its emergency use authorization to permit a booster dose of Comirnaty® for all persons at least 18 years old who completed a primary vaccination series with any FDA-authorized or approved COVID-19 vaccine, which was further expanded to 16- and 17-year-olds on December 9, 2021, and all persons 12 or older on January 3, 2022. On January 3, 2022, the FDA also shortened the time period for administration of the third booster dose of Comirnaty® to five months after competition of the primary vaccination series. On March 29, 2022, the FDA authorized persons over the age of 50 or immunocompromised persons 12 or older to receive a second booster dose four months after the first. On April 18, 2023, the FDA announced that it was limiting the authorized use of the monovalent version of the COVID-19 vaccine in favor of its bivalent equivalent described below.**

**ANSWER:** Pfizer and BioNTech admit the allegations in Paragraph 68.

69.     **Upon information and belief, Defendants have also designed and received regulatory authorization for a bivalent vaccine dose that incorporates both BNT162b2 and additional drug substance tailored for the Omicron BA.4/BA.5 subvariants. On August 31, 2022, for instance, the FDA granted**

NOONAN LANCE BOYER & BANACH LLP

29

**emergency use authorization for the bivalent vaccine in persons 12 and older. On October 12, 2022, the FDA granted emergency use authorization for the bivalent vaccine for children 5–11 years old. On December 8, 2022, the FDA granted emergency use authorization for children between six months and four years of age.**

**ANSWER:** Pfizer and BioNTech admit the allegations in Paragraph 69.

**70.   Upon information and belief, Pfizer has received analogous regulatory approval and/or authorization for Comirnaty®, bivalent versions of Comirnaty®, and similar COVID-19 vaccines in countries around the world.**

**ANSWER:** Pfizer and BioNTech admit the allegations in Paragraph 70.

**71.   Upon information and belief, Pfizer shares profits from Comirnaty® (here and below including all versions of Defendants' COVID-19 vaccines) with BioNTech.**

**ANSWER:** Pfizer and BioNTech admit the allegations in Paragraph 71.

**72.   Upon information and belief, Pfizer recognized approximately $154 million in revenues in 2020 from sales of Comirnaty®. All sales occurred in the United States.**

**ANSWER:** Pfizer admits that financial statements incorporated into Pfizer's SEC Form 10-K for the year ended December 31, 2020 report revenues associated with BNT162b2 as $154 million.   BioNTech lacks information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 72 and therefore denies the same.   To the extent the allegations in Paragraph 72 are inconsistent with Pfizer's filing, Pfizer and BioNTech deny them.

**73.   Upon information and belief, Pfizer recognized approximately $36.8 billion in revenues in 2021 from sales of Comirnaty®. Approximately $7.8 billion in revenues traced to domestic sales. Approximately $29.0 billion in revenues traced to international sales.**

**ANSWER:** Pfizer admits that financial statements incorporated into Pfizer's SEC Form 10-K for the year ended December 31, 2021 report global revenues associated with direct sales and alliance revenues of Comirnaty® as $36.781 billion, comprised of $7.809 billion in U.S. revenue and $28.972 billion in international

NOONAN LANCE BOYER & BANACH LLP

{02446246}

revenue.  BioNTech lacks information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 73 and therefore denies the same.  To the extent the allegations in Paragraph 73 are inconsistent with Pfizer's filing, Pfizer and BioNTech deny them.

**74.    Upon information and belief, Pfizer recognized approximately $37.8 billion in revenues in 2022 from sales of Comirnaty®. Approximately $8.8 billion in revenues traced to domestic sales. Approximately $29.0 billion in revenues traced to international sales.**

**ANSWER:** Pfizer admits that financial statements incorporated into Pfizer's SEC Form 10-K for the year ended December 31, 2022 report global revenues associated with direct sales and alliance revenues of Comirnaty® as $37.806 billion, comprised of $8.775 billion in U.S. revenue and $29.032 billion in international revenue.  BioNTech lacks information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 74 and therefore denies the same.  To the extent the allegations in Paragraph 74 are inconsistent with Pfizer's filing, Pfizer and BioNTech deny them.

**75.    Upon information and belief, Pfizer recognized about $3.1 billion in revenues in the first quarter of 2023 from sales of Comirnaty®. Defendants anticipate billions an annual revenue from sales of Comirnaty® going forward.**

**ANSWER:** Pfizer admits that financial statements incorporated into Pfizer's SEC Form 10-Q for the quarter ended April 2, 2023 report global revenues associated with direct sales and alliance revenues of Comirnaty® as $3.064 billion, and that the same filing anticipates deferred revenue of more than $1 billion.  BioNTech lacks information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 75 and therefore denies the same.  To the extent the allegations in Paragraph 75 are inconsistent with Pfizer's filing, Pfizer and BioNTech deny them.

**76.    Upon information and belief, Pfizer has entered into various contracts to sell COVID-19 vaccines to the United States government. Defendants' vaccine doses made in the United States and administered in the United States were distributed to hospitals, pharmacies, clinics, and numerous**

Noonan Lance Boyer & Banach LLP

other entities for the benefit of individual vaccine recipients in the United States. All of the manufacturing and sales of vaccines distributed in the United States were for the benefit of the American public.

**ANSWER:** Pfizer admits there were various contracts to sell Comirnaty® to the United Stated government, and those contracts speak for themselves. The remaining allegations in Paragraph 76 call for legal conclusions to which no response is required. BioNTech lacks information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 76 and therefore denies the same. To the extent a response is required, Pfizer and BioNTech deny the remaining allegations in Paragraph 76.

**77.** **Upon information and belief, Defendants knew of the existence of the '179 Patent at the time of all acts of infringement alleged herein.**

**ANSWER:** Pfizer and BioNTech deny the allegations in Paragraph 77.

**78.** **On February 8, 2023, Promosome's Chairman, William J. Gedale, sent a letter to Pfizer's General Counsel, Douglas M. Lankler, describing Promosome's "patent-protected RESCUE technology," and offering to have licensing discussions with Pfizer.**

**ANSWER:** Pfizer and BioNTech admit that on February 8, 2023, Promosome's Chairman, William J. Gedale, sent a letter to Pfizer's General Counsel, Douglas M. Lankler, the content of which speaks for itself. Pfizer and BioNTech deny the remaining allegations in Paragraph 78.

**79.** **On March 3, 2023, Scripps contacted Pfizer to encourage it to engage in licensing discussions with Promosome.**

**ANSWER:** Pfizer denies the allegations in Paragraph 79. BioNTech lacks information and knowledge sufficient to form a belief as to the truth of these allegations in Paragraph 79 and therefore denies the same.

**80.** **Mr. Gedale subsequently sent multiple emails to Pfizer employees Jake Wasserman, Yin Yin, and John Androsavich offering to discuss a license to the '179 Patent. In one of those emails on March 10, 2023, Mr. Gedale attached the '179 Patent to his email. In a follow-up email on March 22, Mr. Gedale made**

32

**Case No. 3:23-CV-01048-JES-MMP**

clear that "[w]e believe that Promosome's patented method is employed in the COVID-19 vaccines you jointly developed with BioNTech" and that Promosome "remain[ed] open to licensing [its] technology to you on commercially reasonable terms." Pfizer never responded to this email.

**ANSWER:** Pfizer admits that Mr. Gedale sent Pfizer employees emails, the contents of which speak for themselves. BioNTech lacks information and knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 80 and therefore denies the same. Pfizer and BioNTech deny any remaining allegations in Paragraph 80.

**81.    On April 18, 2023, an Assistant General Counsel at Pfizer, Michael P. Bauer, responded to Mr. Gedale's February 8 letter suggesting that "BioNTech is the appropriate party" with whom to discuss "Promosome's patent-protected RESCUE technology" with respect to Comirnaty®. Mr. Gedale responded with April 21 letters to Pfizer and BioNTech's domestic affiliate, with the latter specifically stating that Promosome's approach is "protected by U.S. Patent No. 8,853,179." These letters have received no response.**

**ANSWER:** Pfizer and BioNTech admit that on April 18, 2023, an Assistant General Counsel at Pfizer, Michael P. Bauer, sent a letter to Mr. Gedale. BioNTech admits that on April 21, 2023, Mr. Gedale sent a letter to BioNTech US Inc. The contents of the letters speak for themselves. Pfizer and BioNTech deny the remaining allegations in Paragraph 81.

**82.    Defendants have never requested from Promosome a license for the '179 Patent.**

**ANSWER:** Pfizer admits that Pfizer has not requested from Promosome a license for the '179 Patent. BioNTech admits that BioNTech has not requested from Promosome a license for the '179 Patent. Pfizer and BioNTech deny that they needed to request a license for the '179 Patent or should have done so.

**83.    Upon information and belief, each defendant knew and should have known that its COVID-19 vaccines infringed the '179 Patent prior to engaging in any of the Infringing Activities, and at the time of all revenues generated by any Accused Product. In the alternative, Defendants were aware of the '179 Patent prior to the filing of this lawsuit based on pre-filing licensing**

33

NOONAN LANCE BOYER & BANACH LLP

**communications. Moreover, Defendants acted deliberately and intentionally in infringing the '179 Patent.**

**ANSWER:** Pfizer and BioNTech deny the allegations in Paragraph 83.

**84.    In willfully infringing the '179 Patent, and for the reasons described above, Defendants engaged in wanton, egregious, and outrageous conduct warranting an award of enhanced damages pursuant to 35 U.S.C. § 284.**

**ANSWER:** Paragraph 84 alleges a legal conclusion to which no response is required.   To the extent a response is required, Pfizer and BioNTech deny the allegations in Paragraph 84.

**85.    Defendants' conduct with respect to the '179 Patent makes this case stand out from others and warrants an award of attorneys' fees pursuant to 35 U.S.C. § 285.**

**ANSWER:** Paragraph 85 alleges a legal conclusion to which no response is required.   To the extent a response is required, Pfizer and BioNTech deny the allegations in Paragraph 85.

<u>**CLAIM 1**</u>
**(Infringement of the '179 Patent)**

**86.    Promosome repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.**

**ANSWER:** Pfizer and BioNTech reallege and incorporate by reference all paragraphs in their Answer above as is fully set forth herein.

**87.    On October 7, 2014, the United States Patent and Trademark Office duly and legally issued the '179 Patent entitled "Reengineering mRNA Primary Structure for Enhanced Protein Production." A true and correct copy of the '179 Patent is attached as Exhibit 1 to this Complaint.**

**ANSWER:** Pfizer and BioNTech admit that the U.S. Patent and Trademark Office issued the '179 Patent on October 7, 2014, but deny that the patent is valid and enforceable.  Pfizer and BioNTech admit that Exhibit 1 purports to be a copy of the '179 Patent.

NOONAN LANCE BOYER & BANACH LLP

{02446246}

34

**Case No. 3:23-CV-01048-JES-MMP**

88.   Promosome owns all substantial rights to the '179 Patent, including the right to assert all causes of action under the '179 Patent and the right to remedies obtained on the '179 Patent. The '179 Patent is fully maintained and is valid and enforceable.

ANSWER:  Pfizer and BioNTech lack information and knowledge sufficient to form a belief as to the truth of whether Promosome owns all substantial rights to the '179 Patent, and so deny the same.  Pfizer and BioNTech deny that the '179 Patent is fully maintained and is valid and enforceable.

89.   Claim 1 of the '179 Patent recites:

1.   A method of improving full-length protein expression efficiency comprising:

a)   providing a polynucleotide comprising:

i)    a coding sequence for the full-length protein;
ii)   a primary initiation codon that is upstream of the coding sequence of the full-length protein, said primary initiation codon encoding the first amino acid of the coding sequence of the full-length protein; and
iii)  one or more secondary initiation codons located within the coding sequence of the full-length protein downstream of the primary initiation codon; and

b)   mutating the one or more secondary initiation codons located within the coding sequence of the full-length protein downstream of the primary initiation codon,

wherein the mutation results in a decrease in initiation of protein synthesis at the one or more secondary initiation codons, thereby increasing expression efficiency of the full-length protein initiated at the primary initiation codon,

wherein mutating the one or more secondary initiation codons located within the coding sequence of the full-length protein downstream of the primary initiation codon comprises mutating one or more nucleotides such that the amino acid sequence of the protein remains unaltered.

NOONAN LANCE BOYER & BANACH LLP

**Case No. 3:23-CV-01048-JES-MMP**

**ANSWER:** Pfizer and BioNTech admit that Paragraph 89 recites Claim 1 of the '179 Patent, but deny that the '179 Patent is valid, enforceable, or infringed.

**90.     Defendants have used and continue to use Promosome's intellectual property without authority or license to do so and are willfully infringing the '179 Patent jointly and/or as agents of one another.**

**ANSWER:** Pfizer and BioNTech deny the allegations in Paragraph 90.

**91.     Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, Claim 1 of the '179 Patent, in violation of 35 U.S.C. § 271(a). Defendants make, use, offer for sale, sell, and/or import certain products made by the patented method, including but not limited to Defendants' BNT162b2/Comirnaty® Vaccine, the Comirnaty Original/Omicron BA.1 Vaccine, and Comirnaty Original/Omicron BA.4/BA.5 Vaccine, and all foreign or domestic equivalents, variations, or dosages thereof (the "Accused Products").**

**ANSWER:** Pfizer and BioNTech deny the allegations in Paragraph 91.

**92.     Defendants' infringing development of the Accused Products includes its internal use, testing, and production of the Accused Products including but not limited to the cDNA or pDNA construct used to produce the Accused Products.**

**ANSWER:** Pfizer and BioNTech deny the allegations in Paragraph 92.

**93.     The method performed by Defendants in the production of the Accused Products satisfy all claim limitations of Claim 1 of the '179 Patent.**

**ANSWER:** Pfizer and BioNTech deny the allegations in Paragraph 93.

**94.     Briefly, the Accused Products comprise an mRNA a polynucleotide that contains the coding sequence for the Covid-19 spike protein and also are derived from cDNA or pDNA, which are also polynucleotides. The native protein contains a primary initiation codon at the start of the coding sequence of the full-length protein. The primary initiation codon encodes the first amino acid of the coding sequence of the full-length protein. The native protein also contains numerous secondary initiation codons located within the coding sequence of the full-length protein downstream of the primary initiation codon as described above. In order to create the Accused Products, Defendants mutated numerous secondary initiation codons located within the coding sequence of the full-length**

36

protein downstream of the primary initiation codon without altering the amino acid sequence of the spike protein. By mutating these secondary initiation codons there is a decrease in initiation of protein synthesis at the one or more secondary initiation codons. As described above, these mutations increase expression efficiency of the full-length protein initiated at the primary initiation codon.

**ANSWER:** Pfizer and BioNTech deny the allegations in Paragraph 94.

**95.** Defendants have received notice and have had actual or constructive knowledge of the '179 Patent since 2015 and at least from the date of pre-filing communications with Mr. Gedale. Defendants have received notice and have had actual or constructive knowledge of the infringing nature of their activities with respect to the Accused Products since they engaged in those activities or, at least, since pre-filing communications with Mr. Gedale.

**ANSWER:** Pfizer and BioNTech deny the allegations in Paragraph 95.

**96.** Since 2020, through its actions, Defendants indirectly infringed and continue to indirectly infringe the '179 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(b). Defendants have actively induced contract vaccine manufacturers to directly infringe the '179 Patent throughout the United States. Further, Defendants have actively induced third parties to use products made by the patented method throughout the United States, including by through sales, education, and advertising efforts, with the goal of actively encouraging directly infringing use of the vaccine.

**ANSWER:** Pfizer and BioNTech deny the allegations in Paragraph 96.

**97.** Defendants do so knowing and intending that contract manufacturers and other third parties will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Products, despite its knowledge of the '179 Patent, thereby specifically intending for and inducing its contract manufacturers to infringe the '179 Patent.

**ANSWER:** Pfizer and BioNTech deny the allegations in Paragraph 97.

**98.** Upon information and belief, the Accused Products constitute a material part of the invention of Claim 1 of the '179 Patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use. Defendants have contributorily infringed and will continue to contributorily infringe Claim 1 of the '179 Patent, literally and/or under the doctrine of equivalents, by promoting the making and use of their COVID-19 vaccines in the

NOONAN LANCE BOYER & BANACH LLP

{02446246}

United States, including by healthcare providers and patients, and knowing that its COVID-19 vaccines are especially made or especially adapted for use to infringe the '179 Patent, in violation of 35 U.S.C. § 271(c).

ANSWER: Pfizer and BioNTech deny the allegations in Paragraph 98.

99.    Upon information and belief, Defendants' have imported, used, sold, and/or offered for sale in the United States a product made by the method of Claim 1 of the '179 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(g). Defendants perform the infringing method to produce cDNA or pDNA, which is used to produce mRNA incorporated into their vaccines, and to produce mRNA, which is incorporated into their vaccines. Defendants make, use, offer for sale, sell, and/or import the Accused Products, which are made by the patented method.

ANSWER: Pfizer and BioNTech deny the allegations in Paragraph 99.

100.    Promosome has suffered and continues to suffer damages because of Defendants' infringement of the '179 Patent in an amount yet to be determined and adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court, as well as other relief prayed for below.

ANSWER: Pfizer and BioNTech deny the allegations in Paragraph 100.

101.    Defendants have known of the '179 Patent or have been willfully blind to its existence and contents since before they commenced the infringing conduct, or in the alternative since before the filing of this lawsuit. Defendants were further aware of Promosome's intellectual property prior to the infringing activity and prior to the filing of this lawsuit. And Defendants were aware that their conduct infringed the '179 Patent. Defendants have nonetheless engaged in infringing conduct as described above and continued to do so in violation of Promosome's patent rights.

ANSWER: Pfizer and BioNTech deny the allegations in Paragraph 101.

102.   Defendants have undertaken their infringing actions despite knowing that such actions infringed Claim 1 of the '179 Patent. Accordingly, Defendants have willfully infringed and continue to willfully infringe Claim 1 of the '179 Patent.

ANSWER: Pfizer and BioNTech deny the allegations in Paragraph 102.

Case No. 3:23-CV-01048-JES-MMP

NOONAN LANCE BOYER & BANACH LLP

{02446246}

## Promosome's Prayer for Relief

The "WHEREFORE" paragraphs following paragraph 102 state Promosome's Prayer for Relief, to which no response is required.  To the extent a response is required, Pfizer and BioNTech deny that Promosome is entitled to any of the relief in the Prayer for Relief, or any relief whatsoever.

\* \* \*

Any allegation in Promosome's complaint not expressly admitted herein is denied. All allegations in the section headers, footnotes, images, or figures of Promosome's complaint are denied.

## AFFIRMATIVE DEFENSES

Pfizer and BioNTech assert the following defenses without prejudice to the denials in this Answer and without admitting any allegations of the complaint not otherwise admitted.  All of the defenses below incorporate by reference the denials and admissions in the Answer and Paragraphs 1 through 83 of their Counterclaims as if fully set forth herein.

Pfizer and BioNTech do not assume the burden of proof on any such defenses, except as required by the applicable law with respect to the particular defense asserted.  Pfizer and BioNTech reserve the right to assert other defenses and/or to supplement or amend its Answer, Affirmative Defenses, and Counterclaims to the complaint upon discovery of facts or evidence rendering such action appropriate.

## FIRST AFFIRMATIVE DEFENSE
### (Non-infringement of the '179 Patent)

1.     The manufacture, use, offer to sell, sale, and/or importation of Comirnaty® does not infringe on any valid claim of the '179 Patent.

## SECOND AFFIRMATIVE DEFENSE
### (Invalidity of the '179 Patent)

2.     Claim 1 of the '179 Patent is invalid for failure to satisfy one or more of the provisions set forth in 35 U.S.C. §§ 100 *et seq*., including, without limitation, the

39

NOONAN LANCE BOYER & BANACH LLP

{02446246}

requirements of 35 U.S.C. §§ 101, 102, 103, 112, 116 and/or any other judicially created requirements for patentability and enforceability of patents and/or in view of the defenses recognized in 35 U.S.C. § 282.

### THIRD AFFIRMATIVE DEFENSE
**(Unenforceability of the '179 Patent due to Inequitable Conduct)**

3.      Federal Circuit law and U.S. Patent and Trademark Office regulations, policies, and procedures impose a duty of disclosure and candor on patent applicants to, among other things, fully disclose all relevant prior art in the course of applying for and prosecuting a patent.  These requirements allow the PTO to fairly determine whether the applied-for patent in fact represents a patentable innovation.   If an applicant breaches these duties, the Federal Circuit recognizes that a patent is unenforceable due to inequitable conduct.

4.      Despite being subject to a duty of disclosure and candor, the Promosome Scientists did not disclose the article titled "Close spacing of AUG initiation codons confers dicistronic character on a eukaryotic mRNA" authored by Daiki Matsuda and Theo W. Dreher and published in 2006 ("2006 Matsuda and Dreher article") to the PTO at any point during the prosecution of the '179 Patent, including after the PTO initially rejected the '179 Patent as anticipated and obvious.

5.      The named inventors of the '179 Patent, including Stephen Chappell, Gerald Edelman, and Vincent Mauro had read the 2006 Matsuda and Dreher article, recognizing its relevance to their own work and acknowledging that it sets forth experimental results inconsistent with the "scanning" theory of translation.  They recruited Daiki Matsuda to work with them at Scripps, and then to work with them at Promosome.

6.      When the PTO initially rejected the '179 Patent as being anticipated or obvious in light of prior art, Stephen Chappell, Gerald Edelman, and Vincent Mauro were faced with a choice:  either accept the PTO's rejection of their patent, or argue the patent was novel because it presented a supposedly novel method of modifying

40

NOONAN LANCE BOYER & BANACH LLP

downstream codons to increase expression from an upstream initiation site, which was supposedly inconsistent with the "scanning" model of translation they published.

7.     As Stephen Chappell, Gerald Edelman, and Vincent Mauro were well aware, Daiki Matsuda and Theo W. Dreher had published this same supposedly novel method—and found the same results—in their 2006 article, and had disclosed that the results were inconsistent with the "scanning" model of translation.

8.     Upon information and belief, Stephen Chappell, Gerald Edelman, and Vincent Mauro nevertheless, and with intent to deceive the PTO, failed to alert the PTO to the 2006 Matsuda and Dreher article, which was material prior art disclosing the claimed innovation in Claim 1 of the '179 Patent.

9.     Upon information and belief, Stephen Chappell, Gerald Edelman, and Vincent Mauro, with intent to deceive the PTO, asserted to the PTO that Claim 1 of the '179 Patent was novel precisely because it posited that downstream alternative initiation codons compete with the primary initiation codon for ribosomes, such that removing these downstream start sites will reduce competition for ribosomes, thereby increasing initiation of protein synthesis from the upstream start site, even though they knew that the 2006 Matsuda and Dreher article had disclosed the same conclusion.

10.     Had Stephen Chappell, Gerald Edelman, and Vincent Mauro disclosed the 2006 Matsuda and Dreher article, the patent examiner would have rejected the application as anticipated and obvious.  In other words, but for the failure to disclose the 2006 Matsuda and Dreher article, the '179 Patent would not have issued.

## FOURTH AFFIRMATIVE DEFENSE
### (Improper Venue)

11.     Venue is not proper in this District as to Pfizer and BioNTech under 35 U.S.C. § 1400 because Pfizer and BioNTech do not "reside" in this District and have not "committed acts of infringement" in this District.

NOONAN LANCE BOYER & BANACH LLP

{02446246}

**Case No. 3:23-CV-01048-JES-MMP**

## FIFTH AFFIRMATIVE DEFENSE
### (Prosecution History Estoppel and Disclaimer)

12.     Promosome is estopped by the doctrines of prosecution history estoppel and prosecution disclaimer from construing any valid claim of the '179 Patent to be infringed to the extent that it does so by relying on arguments that conflict with admissions and/or statements made to the U.S. Patent and Trademark Office during prosecution of the '179 Patent, which statements are each contained in the file history, and/or in the specification and claim of the '179 Patent.

## SIXTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

13.     Promosome's claims are barred, in whole or in part, by Promosome's unclean hands.   Promosome's unclean hands are demonstrated at least by the allegations set forth in Pfizer and BioNTech's Counterclaim allegations.

## SEVENTH AFFIRMATIVE DEFENSE
### (Patent Misuse)

14.     Promosome's claims are barred, in whole or in part, by the doctrine of patent misuse to the extent Promosome has sought to enforce rights not granted by the '179 Patent, either because it is invalid as demonstrated at least by the allegations set forth in Pfizer and BioNTech's Counterclaim allegations, and/or because Promosome seeks to claim damages for uses or products not covered by the Patent, or related to sales or conduct in jurisdictions in which Promosome has no patent-protected intellectual-property rights.

## EIGHTH AFFIRMATIVE DEFENSE
### (No Willful Infringement)

15.     Promosome is not entitled to seek enhanced damages or attorneys' fees for willful and deliberate infringement.

NOONAN LANCE BOYER & BANACH LLP

{02446246}

## NINTH AFFIRMATIVE DEFENSE
### (No Exceptional Case)

16.    Promosome is not entitled to seek an award of attorneys' fees under 35 U.S.C. § 285, but Pfizer and BioNTech are.

## TENTH AFFIRMATIVE DEFENSE
### (Lack of Standing)

17.    Promosome lacks standing to assert the '179 Patent.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

18.    Promosome's complaint fails to state a claim upon which relief can be granted.

## ADDITIONAL DEFENSES

Pfizer and BioNTech reserve all affirmative defenses available under Rule 8(c) of the Federal Rules of Civil Procedure, and any other defenses, at law or in equity, that may be available now or may become available in the future based on discovery or any other factual investigation in this case and will amend if and as appropriate under the Federal Rules of Civil Procedure.

\*   \*   \*

**WHEREFORE**, Pfizer and BioNTech respectfully request the following relief:

a.    An order dismissing Promosome's claim with prejudice;

b.    A judgment that Defendants have not infringed Claim 1 of the '179 Patent;

c.    A judgment that the Claim 1 of the '179 Patent is invalid;

d.    A judgment that the '179 Patent is unenforceable;

e.    A declaration that this is an exceptional case and an award of Defendants' attorneys' fees pursuant to 35 U.S.C. § 285;

f.    An award of Defendants' costs and expenses in this action; and

NOONAN LANCE BOYER & BANACH LLP

g.      Such further and other relief as this Court may deem just and proper.

## COUNTERCLAIMS

Without admitting any of the allegations of Counterclaim-Defendant Promosome, LLC other than those expressly admitted herein, and without prejudice to the right of Counterclaim-Plaintiffs Pfizer Inc. ("Pfizer"), BioNTech SE and BioNTech Manufacturing GmbH (collectively, "BioNTech") to plead additional counterclaims as the facts of the matter warrant, Counterclaim-Plaintiffs assert the following counterclaims against Counterclaim-Defendant Promosome.

### Parties

1.      Counterclaim-Plaintiff Pfizer is a corporation organized and existing under the laws of Delaware, with its principal place of business at 66 Hudson Boulevard East, New York, New York 10001.

2.      Counterclaim-Plaintiff BioNTech SE is a company organized and existing under the laws of Germany, with its principal place of business at An der Goldgrube 12, Mainz, 55131 Germany.

3.      Counterclaim-Plaintiff BioNTech Manufacturing GmbH, a wholly-owned subsidiary of BioNTech SE, is a company organized and existing under the laws of Germany, with its principal place of business at An der Goldgrube 12, Mainz, 55131 Germany.

4.      Upon information and belief, and based on Counterclaim-Defendant Promosome's allegations, Promosome is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 48 Gurley Road, Stamford, CT 06902.

5.      Plaintiff alleges that Promosome was "created to develop and commercialize" the work of Gerald Edelman and Vincent Mauro, and, upon information and belief, Promosome employed Vincent Mauro, Stephen A. Chappell, Wei Zhou, and Gerald M. Edelman, who are listed as inventors on the '179 Patent. The knowledge and acts or omissions of Vincent Mauro, Stephen A. Chappell, Wei

NOONAN LANCE BOYER & BANACH LLP

44

Zhou, and Gerald M. Edelman are attributable to Promosome to the extent those acts or omissions were conducted in the course of their employment at Promosome. This includes knowledge, acts, or omissions relevant to the prosecution of U.S. Patent No. 8,853,179 ("the '179 Patent").

## Jurisdiction and Venue

6.     Counterclaim-Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202. The Court has jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.     Pfizer disputes that venue is proper in this District as to Promosome's claims against it, and expressly reserves all rights and defenses as to the propriety of venue, but venue is proper as to these Counterclaims because they are compulsory Counterclaims that must be asserted in the same action as Promosome's claims against Pfizer.

8.     This action is based on an actual controversy between the parties arising from allegations of infringement of the '179 Patent.

9.     Pfizer and BioNTech SE announced an agreement to globally co-develop a COVID-19 vaccine in March of 2020. The vaccine is an mRNA-based vaccine, and received an Emergency Use Authorization from the FDA on December 11, 2020.

10.    On June 6, 2023, Promosome sued Counterclaim-Plaintiffs for infringement of the '179 Patent, alleging that Counterclaim-Plaintiffs used the claimed subject matter of the '179 Patent in an infringing manner.

11.    Prior to June 6, 2023, Promosome did not provide Counterclaim-Plaintiffs with any notice of alleged infringement of the '179 Patent.

12.    Counterclaim-Plaintiffs deny they have infringed, continue to infringe, or will infringe any valid and enforceable claim of the '179 Patent.

NOONAN LANCE BOYER & BANACH LLP

{02446246}

13.    In view of the foregoing, a conflict of asserted rights has arisen between Counterclaim-Plaintiffs and Counterclaim-Defendant with respect to the noninfringement and invalidity of the relevant claim of the '179 Patent.

14.    Counterclaim-Plaintiffs have further asserted that the '179 Patent is invalid for failure to satisfy one or more of the provisions of Title 35 of the United States Code, including without limitation 35 U.S.C. §§ 101, 102, 103, 112, and/or the doctrine of obviousness type double patenting and/or any other judicially created requirements for patentability and enforceability of patent, and the defenses recognized in 35 U.S.C. § 282.

**Background on Patentability and the Patent Process**

15.    One of the primary purposes of the U.S. patent system is to foster innovation by providing an incentive for research and development.  The U.S. Constitution itself provides in Article I, Section 8, Clause 8 that Congress shall have the power "[t]o promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."

16.    The U.S. Patent and Trademark Office ("PTO") fulfills Congress's mandate.  Patent examiners at the PTO evaluate patent applications and determine whether they should be granted or rejected by examining the applications themselves, as well as a wide array of other materials.  These other materials include other patent literatures related to the claimed invention, as well as other publications that may bear on whether the claimed intention meets the requirements for patentability set forth in 35 U.S.C. §§ 101, 102, 103, and 112.

17.    Under Section 101, an invention must be "useful."  "[S]ubject to the conditions and requirements" of the rest of the statute, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of

NOONAN LANCE BOYER & BANACH LLP

**Case No. 3:23-CV-01048-JES-MMP**

matter, or any new and useful improvement thereof, may obtain a patent therefor."  35 U.S.C. § 101.

18.  Under Section 102, an invention must be "novel."  Because patents are intended to promote the development of new ideas and protect those new ideas for a period of time, the PTO will reject patent applications if the patented invention is not new.  Thus, subject to certain exceptions, a patent will not issue if—before the effective date of the patent application—the claimed invention was already patented or was "described in a printed publication."  35 U.S.C. § 102.  When examining a patent application for novelty, earlier patents and printed publications are referred to as "prior art."

19.  Section 103 further guards the novelty of legitimate patents by providing that a patentable invention cannot be obvious in light of prior art to someone having ordinary skill in the relevant art to which an invention pertains.  Thus, if at the time of the patent application, a person of ordinary skill in the relevant art to which the invention pertains could have used earlier patents, articles, or other information alone or in combination and develop the claimed idea, then the inventor would not be entitled to a patent, and the PTO will deny the application.

20.  Under Section 112, a patent's specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention."  35 U.S.C. § 112.

21.  Sections 101, 102, 103, and 112 set out an interlocking set of requirements for patentability.

22.  The exclusionary rights granted by a patent are potent rights the public must accept in exchange for the inventor disclosing its invention.  And because these

47

NOONAN LANCE BOYER & BANACH LLP

{02446246}

exclusionary rights impose burdens on the public, the public has a strong interest in ensuring that individuals do not deceive the Patent Office into issuing a patent.

23.     To ensure that the public is adequately protected from fraudulently procured patents, all patent applicants must conduct themselves with the "highest degree of candor and good faith" in their interactions with the Patent Office. *Kingsland v. Dorsey*, 338 U.S. 318, 319 (1949).  PTO regulations provide that "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section."  37 C.F.R. § 1.56(a).

24.     The duty to disclose sweeps broadly and encourages applicants to consider "[t]he closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office."  37 C.F.R. § 1.56(a)(2).  Information that is considered material—and therefore must be disclosed—is any information that is not cumulative of material already in the record and which "establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim," or "refutes, or is inconsistent with, a position the applicant takes in . . . opposing an argument of unpatentability relied on by the Office, or [a]sserting an argument of patentability." *Id.* § 1.56(b).  This duty applies both to the applicant, the individual inventors listed on the patent, the patent's assignee, and "[e]very other person substantively involved in the preparation or prosecution of the application and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application."  *Id.* § 1.56(c).  And the duty is continuing for the entire period the patent application is pending, requiring all these individuals to submit material information to the PTO until the patent is either denied or issued.  *Id.* § 1.56(a).

NOONAN LANCE BOYER & BANACH LLP

{02446246}

25.     Each inventor named in a patent must execute an oath or declaration including a statement that they believe themselves to be the original inventor (or joint inventors) of the patented innovation.  37 C.F.R. § 1.63(a); *see also* 35 U.S.C. § 115.

### Promosome and the Promosome Scientists
### Withheld Known, Material Prior Art from the Patent Office

26.     Upon information and belief, despite the obligations set out above, Promosome and inventors Vincent Mauro, Stephen A. Chappell, Wei Zhou, and Gerald M. Edelman (the "Promosome Scientists," each of whom was named as an inventor on the '179 Patent and associated application) intentionally withheld material prior art showing that Claim 1 of the '179 Patent was invalid with the intent to deceive the PTO.  These individuals were actually aware of such material prior art and subject to the duty to disclose, but failed to do so.

27.     In the background section of the '179 Patent specification, the Promosome Scientists state that "[t]he present method allows for improved and more efficient protein expression and reduces the competition between various initiation codons for the translation machinery." *See* '179 Patent at 10:8-10.

28.     In the '179 Patent specification, the Promosome Scientists describe how the "tethering and clustering models of translation initiation" suggest that "[t]ranslation initiation at downstream initiation codons, or secondary initiation sites, can compete with the authentic initiation codon, or primary initiation site, for ribosomes and lower the expression of the encoded protein.  Decreasing the availability of these secondary initiation sites, such as by mutating them into a non-initiation codon, increases the availability of the primary initiation sites to the ribosome and a more efficient encoded protein expression." *See* '179 Patent at 9:58-10:7.

29.     Similarly, according to Promosome's complaint, the '179 Patent's allegedly novel innovation is the suggestion that protein expression can be increased by eliminating a downstream initiation codon without altering the amino acid

{02446246}

NOONAN LANCE BOYER & BANACH LLP

sequence of the protein encoded by an mRNA sequence.  Compl. ¶¶ 4, 5, 42.  The complaint further alleges that "the Promosome Scientists discovered a method for modifying mRNA to remove alternative or secondary start sites, and thus avoid competition between potential start sites, effectively directing more ribosomes to the authentic start site by reducing the unproductive diversion of ribosomes by the alternative start sites." *Id.* at ¶ 5.

30.     But the method described and claimed in the '179 Patent is not novel.  Since at least the 1980s, several scientists have hypothesized that initiation does not always follow a linear scanning model, but may in fact occur at downstream initiation codons even when an upstream initiation codon is available and encountered first through linear scanning.  They have demonstrated this concept by mutating downstream initiation codons to alter their function, all while not changing the amino acid sequence of the encoded protein from an upstream initiation codon.  After mutation of the downstream initiation codons, these scientists observed a corresponding increase in protein expression from the upstream initiation codon, leading them to conclude that mutation of a downstream initiation codon will enhance protein expression from an upstream initiation codon.  And they have published these results—as relevant here—in prior art articles that were not disclosed to the PTO during prosecution of the '179 Patent.

31.     These published prior art articles include, among others, those co-authored by Theo Dreher and/or Daiki Matsuda which investigated, *inter alia*, modulation of full-length protein expression between an upstream AUG initiation codon and a downstream out-of-frame AUG initiation codon in Turnip Yellow Mosaic Virus ("TYMV") RNA.  *See* J. Weiland and T. Dreher, *Infectious TYMV RNA from cloned cDNA: effects* in vitro *and* in vivo *of point substitutions in the initiation codons of two extensively overlapping ORFs*, 17 NUCLEIC ACIDS RES. 4675 (1989); D. Matsuda *et al.*, *Expression of the Two Nested Overlapping Reading Frames of Turnip Yellow Mosaic Virus RNA is Enhanced by a 5′ Cap and by 5′ and 3′ Viral Sequences*, 78 J. VIROLOGY

50

9325 (2004); D. Matsuda and T. Dreher, *Close spacing of AUG initiation codons confers dicistronic character on a eukaryotic mRNA*, 12 RNA 1338 (2006); D. Matsuda and T. Dreher, *Cap- and initiator tRNA-dependent initiation of TYMV polyprotein synthesis by ribosomes: Evaluation of the Trojan horse model for TYMV RNA translation*, 13 RNA 129 (2007).  The PTO would have rejected Claim 1 of the '179 Patent based on these prior art references.  As such, each of these prior art references is material to the patentability of claim 1 and was not submitted to the PTO.

32.     In May 2006, Daiki Matsuda and Theo Dreher published an article entitled "Close spacing of AUG initiation codons confers dicistronic character on a eukaryotic mRNA" (the "2006 Matsuda and Dreher article").   The article was published in print in the *RNA* journal in July 2006.  A true and correct copy of the printed article is attached hereto as Exhibit 2.

33.     The 2006 Matsuda and Dreher article discloses all of the limitations that the Promosome Scientists would later recite in Claim 1 of the '179 Patent, and of which Promosome alleges that Pfizer and BioNTech infringe.  Among other striking similarities between the article and the '179 Patent, the article explained that the authors mutated a downstream initiation codon without altering the amino acid sequence of the encoded protein from an upstream initiation codon. *See* Ex. 2 at 1340. As "a direct response to the removal of the downstream initiation site," the authors found increased protein expression from an upstream initiation codon. *See id*.

34.     Daiki Matsuda and Theo Dreher further observed that "[a]typical of normal, polar leaky scanning, the two closely spaced initiation sites appear to be coupled and in competition with each other." *Id*.  The authors explained that they interpreted the results of their experiments "as emphasizing the competitive relationship between initiation at the two AUGs and as indicating that initiation choices by ribosomes are probabilistic rather than all-or-nothing." *See id.* at 1341. Their experiments also "verifie[d] that the coupling between" the two AUG initiation codons "originates from the initiation step." *See id.* at 1344.

NOONAN LANCE BOYER & BANACH LLP

35.   Thus, although Promosome's complaint alleges that the '179 Patent is based on the Promosome Scientists' non-linear mechanism of translation, and "the thrust of [the] alternative mechanisms then-hypothesized by the Promosome Scientists is that . . . . the secondary initiation codons effectively competed with the primary initiation codon," Compl. ¶ 37, that idea (along with the express elements of Claim 1) already appeared in the prior art, including the 2006 Matsuda and Dreher article and other material prior art publications.  *See, e.g.*, ¶¶ 31-34 of Counterclaims.

36.   Promosome and the Promosome Scientists plainly knew at the time of their patent application that material prior art, including the 2006 Matsuda and Dreher article, anticipated their patented claim.  Indeed, an article authored by Stephen A. Chappell, Gerald M. Edelman, and Vincent P. Mauro—three of the Promosome Scientists—had previously referred to the 2006 Matsuda and Dreher article, acknowledging that Matsuda and Dreher's work observed competitive behavior between upstream and downstream initiation codons.  Chappell *et al.*, "Ribosomal tethering and clustering as mechanisms for translation initiation," 103 PNAS 18077 (2006).  A true and correct copy of this article is attached hereto as Exhibit 1.

37.   In that article, Chappell, Edelman, and Mauro summarized scientific observations from other laboratories and provided their additional impressions.  They wrote, citing for support an endnote that was in fact the 2006 Matsuda and Dreher article (endnote 10):

- that a "key prediction of the tethering and clustering" hypotheses is that "translation can initiate at AUG codons located both upstream and downstream of IRES," which is "consistent with various observations from other laboratories," Ex. 1 at 18077 (citing endnotes 4, 9, 10, and 13);

- that "[a] scanning mechanism does not . . . readily explain why translation at AUG codons located farther from the ribosomal recruitment site becomes less and less efficient with increasing distance," Ex. 1 at 18080 (citing endnotes 4, 9, 10, and 12);

NOONAN LANCE BOYER & BANACH LLP

{02446246}

52

**Case No. 3:23-CV-01048-JES-MMP**

- that "[d]ata from several studies indicate that the relative utilization of two or more AUG codons is determined in large part by their distance from the ribosomal recruitment site," Ex. 1 at 18077 (citing endnotes 4, 9, and 10);

- that "[t]he effects of distance on translation were also seen in a study of the turnip yellow mosaic virus RNA," and observing that "when the second AUG codon was spaced further downstream, its utilization decreased dramatically, whereas that of the uAUG codon increased so that almost all translation initiated at this codon.  The ability of the position of the second AUG codon to affect the utilization of the uAUG codon suggests that the two codons competed for translation machinery," Ex. 1 at 18080 (citing endnote 10); and

- that "[a] recent study has provided the suggestion that backward movement can occur" in mRNA translation, albeit "only to a maximum of 15 nt." "Nevertheless," they continue, "the scanning hypothesis does not appear generally to account for this type of movement,"  Ex. 1 at 18080 (citing endnotes 10 and 26).

38.    Chappell, Edelman, and Mauro knew of the 2006 Matsuda and Dreher article and the fact that it disclosed what Promosome claims is the core innovation of the '179 Patent:  that downstream initiation codons may compete with upstream initiation codons for initiation of mRNA translation.

39.    The Promosome Scientists again showed their subjective knowledge of Matsuda's work—and its value to their enterprise—when they invited Matsuda to become a research associate at the Scripps Research Institute ("Scripps"), where the Promosome Scientists worked.  Upon information and belief, Matsuda began working at Scripps with the Promosome Scientists in January 2008.

40.    On February 24, 2009, U.S. Provisional Patent Application No. 61/155,049 (the "'049 provisional application") was filed, listing Stephen Chappell, Gerald Edelman, Vincent Mauro, and Wei Zhou as inventors.

41.    On May 26, 2009, the Promosome Scientists allegedly assigned their rights in the '049 provisional application to Scripps.  According to the allegations in Promosome's complaint, Scripps then granted a license to Promosome for all patents

NOONAN LANCE BOYER & BANACH LLP

{02446246}

deriving from the '049 provisional application. Comp. ¶ 6. On February 24, 2010, a Patent Cooperation Treaty application No. PCT/US2010/000567 was filed, claiming priority to the '049 provisional application.

42.     On November 3, 2011, Scripps filed U.S. Patent Application No. 13/203,229 ("the '229 application") with the PTO, which is a U.S. national stage entry of PCT/US2010/000567 and claimed priority to the '049 provisional application.[1] During the pendency of the '229 application, the Promosome Scientists and Promosome, working with their representatives (collectively, "the Applicants"), were subject to duties of candor and disclosure to the PTO, including a duty to disclose material prior art.

43.     The '229 application was initially filed with 23 claims. Despite submitting other academic papers and other materials for the PTO's consideration, and despite Daiki Matsuda's employment at Scripps and close working relationship with Vincent Mauro, the Applicants never submitted the 2006 Matsuda and Dreher article, or any of the other material prior art papers on TYMV co-authored and associated with Matsuda, to the PTO.

44.     In November 2010, Vincent Mauro and Daiki Matsuda together published a paper entitled "Determinants of Initiation Codon Selection during Translation in Mammalian Cells" in *PLOS One*, again reflecting their awareness of Matsuda's published work on TYMV, including the 2006 Matsuda and Dreher article. Despite knowledge of the 2006 Matsuda and Dreher article, the Applicants never submitted Matsuda's material prior art publications to the PTO.

---

[1] The submissions and PTO materials associated with the '179 Patent—commonly referred to by patent practitioners as the "file history"—is available online through the PTO's website. U.S. PTO Patent Center, *13/203,229 | PROO-003/N01US322094-2042:REENGINEERING MRNA PRIMARY STRUCTURE FOR ENHANCED PROTEIN PRODUCTION*, https://patentcenter.uspto.gov/applications/13203229/ifw/docs?application=. The materials are hereby incorporated by reference into Counterclaim-Plaintiffs' allegations.

NOONAN LANCE BOYER & BANACH LLP

{02446246}

45.    On June 26, 2013, the PTO Examiner issued a Non-Final Rejection of all claims pending in the '229 Application.  The PTO Examiner rejected Claim 1 as being anticipated by prior art under Section 102, and as being obvious under Section 103.  The PTO Examiner explained that, in light of prior work by Marilyn Kozak, a giant in the history of mRNA research, "[i]t would have been *prima facie* obvious to a person of ordinary skill in the art at the time the invention was made, namely to mutate one or more initiation codons out of frame with coding sequence to increase the full-length protein expression efficiency.  One of ordinary skill in the art would have been motivated to carry out the claimed method because initiation codons out of frame of the coding sequence can impact the full-length protein expression." *See* June 26, 2013 Non-Final Rejection at 7-8.   The PTO Examiner also found that the invention was anticipated by work by Kwon *et al.* or Kozak.

46.    On September 20, 2013, the Applicants responded to the PTO's June 26, 2013 Non-Final Rejection in the '229 Application by amending Claim 1 to recite, *inter alia*, that the mutating step only applied to the one or more secondary initiation codons "located within the coding sequence of the full-length protein downstream of the primary initiation codon." *See* September 20, 2013 Amendment and Response at 2.

47.    At the same time, the Applicants also argued that their invention differed from the prior art cited by the PTO Examiner because "[t]he claimed methods are based upon the inventors' alternative model of translation initiation which predicts that ribosomes may initiate at various start sites downstream from the primary initiation codon (as opposed to Kozak's 'scanning model' . . .).  According to the inventors' model, downstream alternative initiation codons compete with the primary initiation codon for ribosomes.  Thus, this model predicts that removing these downstream start sites will reduce competition for ribosomes, thereby increasing initiation from the authentic start site, *even if the alternative initiation codons are out*

NOONAN LANCE BOYER & BANACH LLP

{02446246}

*of frame*.   This is described in the specification . . . ."  *See* September 20, 2013 Amendment and Response at 8 (emphasis in original).

48.    The Applicants continued that "[n]either Kwon nor Kozak describe or suggest the claimed method.  In fact, the claimed methods would not be expected to increase expression efficiency of the full-length protein according to the 'scanning' model of translation initiation which is assumed by both Kwon and Kozak to be the operative model."  *Id.* at 9.

49.    In conjunction with their statements, the Applicants submitted two additional pieces of prior art, but not the 2006 Matsuda and Dreher article, nor any of the other material prior art papers on TYMV co-authored by Matsuda.

50.    While arguing that the concept of competition between initiation codons in coding sequences to be an important aspect of the method described and claimed in the '179 Patent, and an alleged distinction relative to the prior art, the Applicants did not disclose to the PTO material and known prior art disclosing that same observation.

51.    As Stephen Chappell, Gerald Edelman, and Vincent Mauro knew from the 2006 Matsuda and Dreher article, it disclosed every element of Claim 1—and, indeed, every element the Applicants represented to the PTO as being novel, in order to get the PTO Examiner to reverse his rejection and allow Claim 1.

52.    Thus, although Applicants argued to the PTO that the method in Claim 1 was novel because it was "based upon the inventors' alternative model of translation initiation which predicts that ribosomes may initiate at various start sites downstream from the primary initiation codon (as opposed to Kozak's 'scanning model' . . .)," the 2006 Matsuda and Dreher article already disclosed that ribosomes may initiate at various start sites downstream from the primary initiation codon, unlike in the scanning model.

53.    Although Applicants argued to the PTO that "[a]ccording to the inventors' model, downstream alternative initiation codons compete with the primary

56

{02446246}

NOONAN LANCE BOYER & BANACH LLP

initiation codon for ribosomes," and "[t]hus . . . predicts that removing these downstream start sites will reduce competition for ribosomes, thereby increasing initiation from the authentic start site, *even if the alternative initiation codons are out of frame*," they knew that the 2006 Matsuda and Dreher article disclosed that downstream alternative initiation codons competed with the primary initiation codon for ribosomes.   They also knew that the article documented that mutating the downstream alternative initiation codons increased initiation from the "authentic"— *i.e.*, upstream—start site.   And they knew that the article disclosed that this result pertained even if the alternative initiation codons were out of frame.

54.    Although Applicants argued to the PTO that "neither Kwon nor Kozak describe or suggest the claimed method," they knew that the 2006 Matsuda and Dreher article *did* "describe" the claimed method, because that paper disclosed mutation of a downstream, out-of-frame initiation codon without changing the amino acid sequence of the encoded protein, while observing a resulting increase in protein expression from the upstream initiation codon.

55.    And Applicants were further aware that the 2006 Matsuda and Dreher article disclosed the claimed method, as mutation of a downstream initiation codon in the article "resulted in a 2.5-fold higher expression rate from the upstream" initiation codon, and experimental results "indicate[d] that the increased expression . . . was a direct response to the removal of the downstream initiation site.  Atypical of normal, polar leaking scanning, the two closely spaced initiation sites appear to be coupled and in competition with each other."  *See* Ex. 2 at 1340.

56.    On October 25, 2013, the PTO Examiner reversed his decision that Claim 1 was anticipated or obvious in view of the prior art before him.  Other claims were rejected under Section 112.

NOONAN LANCE BOYER & BANACH LLP

{02446246}

57.     Upon information and belief, in January 2014, Daiki Matsuda left Scripps Research Institute and joined Promosome LLC.

58.     The '179 Patent ultimately issued on October 7, 2014, including Claim 1 as the only claim.

59.     At no point during prosecution did the Applicants disclose the 2006 Matsuda and Dreher article, or any of the other material prior art publications on TYMV co-authored and associated with Daiki Matsuda, to the PTO.

60.     The 2006 Matsuda and Dreher article, among others, is material prior art that was required to be disclosed to the PTO.  The article would have been material to the PTO's decision to issue the patent, and was not cumulative of the material already submitted to the PTO.

61.     When the PTO initially rejected the application, it held that the '179 Patent was anticipated or obvious over prior art.  The Applicants argued successfully for the PTO to change its mind based on a claim of novelty and originality that the 2006 Matsuda and Dreher article—which Applicants knew of but failed to disclose to the PTO—conclusively foreclosed.  But for the withholding of the 2006 Matsuda and Dreher article, the '179 Patent would not have issued, because the Examiner would have recognized that the 2006 Matsuda and Dreher article disclosed every limitation of Claim 1, and that prior art disclosed that upstream and downstream initiation codons in coding sequences compete for ribosomes, and mutating downstream, out-of-frame initiation codons would lead to an increase in initiation from the upstream initiation codon.

62.     Vincent Mauro, in a webinar published on May 14, 2015,[2] described the contents of the 2006 Matsuda and Dreher article.  In this webinar, Vincent Mauro

_____

[2]  *See* Vincent P Mauro, Labroots, *Regulation of mRNA translation by ribosomes*, https://www.labroots.com/webinar/regulation-of-mrna-translation-by-ribosomes (May 14, 2015 12:00 PM PDT) (Presented at Genetics and Genomics Virtual Event Series 2015).

NOONAN LANCE BOYER & BANACH LLP

58

discussed certain findings from the article to exemplify how "*AUG codons sometimes appear to compete for ribosomes*," on a slide about the scanning hypothesis for mRNA translation and some inconsistent observations. Starting at 11 minutes and 43 seconds of this May 14, 2015 webinar, Vincent Mauro offered the following remarks, which refer to the 2006 Matsuda and Dreher article:

> A very interesting observation is that, often times, if you have two AUGs codons that are close to each other, they appear to compete for ribosomes, and for example, in a very nice study, it was in turnip yellow mosaic virus, two closely spaced AUG codons were both utilized—and many studies have shown utilization of multiple AUG codons— but what was interesting here is that when the second AUG codon was progressively spaced further from the first, the use of the first one went up, which is inconsistent with the unidirectional scanning model, and suggests that the ribosome was sampling[.]

63.     Vincent Mauro's comments acknowledge that the 2006 Matsuda and Dreher article anticipates the method in the '179 Patent and refute the Applicants' statements to the PTO Examiner that Claim 1 of the Patent was based on a "novel" alternative to the scanning model developed in the first instance by the Promosome Scientists.

64.     All of the foregoing, taken together, demonstrates that the Promosome Scientists and Promosome knew of the prior art teachings, including those in the 2006 Matsuda and Dreher article, and nonetheless withheld that prior art from the PTO during prosecution of the '179 Patent. Indeed, this art was withheld while the Applicants emphatically advanced a position to distinguish over the prior art that was contrary to what the Promosome Scientists and Promosome knew was disclosed in

NOONAN LANCE BOYER & BANACH LLP

59

{02446246}

**Case No. 3:23-CV-01048-JES-MMP**

the prior art.  These allegations collectively show that the Promosome Scientists and Promosome intended to deceive the PTO during prosecution of the '179 Patent.

## COUNTERCLAIM COUNT I
### Declaration of Noninfringement of the '179 Patent

65.     Counterclaim-Plaintiffs reallege and incorporate by reference Paragraphs 1 through 64 of its Counterclaims as if fully set forth herein.

66.     This Counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. 28 §§ 2201 and 2202. An actual, substantial, and continuing justiciable controversy having adverse legal interest of sufficient immediacy and reality to warrant the issuance of a declaration of rights by the Court exists between Counterclaim-Plaintiffs and Counterclaim Defendant Promosome concerning infringement of the '179 Patent.

67.     Counterclaim Defendant has accused Counterclaim-Plaintiffs of activities that it alleges infringe Claim 1 of the '179 Patent ("Accused Activities").

68.     Counterclaim-Plaintiffs deny that they have infringed any valid and enforceable claim of the '179 Patent, including for at least the reason that Counterclaim-Plaintiffs have not made, used, offered to sell, sold, or imported any product that meets the limitations of any claim of the '179 Patent.

69.     Counterclaim-Plaintiffs are entitled to a judicial determination that they have not infringed and will not infringe any valid claim of the '179 Patent, including by performance of the alleged Accused Activities.

## COUNTERCLAIM COUNT II
### Declaration of Invalidity of the '179 Patent

70.     Counterclaim-Plaintiffs incorporate by reference Paragraphs 1 through 69 of their Counterclaims as if fully set forth herein.

71.     Claim 1 of the '179 Patent is invalid for failure to satisfy one or more of the provisions set forth in 35 U.S.C. §§ 100 *et seq.*, including, without limitation, the requirements of 35 U.S.C. §§ 101, 102, 103, 112, 116 and/or any other judicially

NOONAN LANCE BOYER & BANACH LLP

created requirements for patentability and enforceability of patents and/or in view of the defenses recognized in 35 U.S.C. § 282.

## COUNTERCLAIM COUNT III
### Declaration of Unenforceability

72.    Counterclaim-Plaintiffs incorporate by reference Paragraphs 1 through 71 of their Counterclaims as if fully set forth herein.

73.    The '179 Patent is unenforceable as a result of the Promosome Scientists' and Promosome's inequitable conduct during the prosecution of the '179 Patent.

74.    Federal Circuit law and U.S. Patent and Trademark Office regulations, policies, and procedures impose a duty of disclosure and candor on patent inventors and associated persons to, among other things, fully disclose all relevant prior art in the course of applying for and prosecuting a patent. These requirements are important for the PTO to determine whether the applied-for patent in fact represents a patentable innovation.

75.    The Promosome Scientists and Promosome, Vincent P. Mauro, Stephen A. Chappell, Wei Zhou, and Gerald M. Edelman were subject to the duty of candor under 37 C.F.R. § 1.56 but, upon information and belief, violated their legal obligations by withholding information from the USPTO that was material to the prosecution of the '179 Patent and noncumulative of information of record. Specifically, despite being subject to a duty of disclosure and candor, the Promosome Scientists and Promosome did not disclose the 2006 Matsuda and Dreher article to the PTO, which they were aware of, during the prosecution of the '179 Patent—including after the PTO initially rejected the patent as anticipated and obvious.

76.    For example, Stephen Chappell, Gerald Edelman, and Vincent Mauro were aware of the 2006 Matsuda and Dreher article, recognizing its relevance to their own work and acknowledging that it set forth experimental results inconsistent with

NOONAN LANCE BOYER & BANACH LLP

the "scanning" theory of translation. They recruited Daiki Matsuda to work with them at Scripps, and then to work with them at Promosome.

77.    When the PTO initially rejected the '179 Patent as being anticipated or obvious in light of prior art, Stephen Chappell, Gerald Edelman, and Vincent Mauro were faced with a choice:  either accept the PTO's rejection of their patent, or argue the patent was novel because it presented a supposedly novel method of modifying downstream codons to increase expression from an upstream initiation site, which was allegedly inconsistent with the "scanning" model of translation.

78.    As at least Stephen Chappell, Gerald Edelman, and Vincent Mauro were well aware, Daiki Matsuda and Theo Dreher had published this method—and found the same results—in 2006, and had disclosed that the results were inconsistent with the "scanning" model of translation.

79.    Upon information and belief, at least Stephen Chappell, Gerald Edelman, and Vincent Mauro nevertheless, and with intent to deceive the PTO, failed to disclose to the PTO the 2006 Matsuda and Dreher article, which was material prior art disclosing the subject matter recited in Claim 1 of the '179 Patent.

80.    Upon information and belief, at least Stephen Chappell, Gerald Edelman, and Vincent Mauro, with intent to deceive the PTO, asserted to the PTO that Claim 1 of the '179 Patent was novel precisely because it posited that downstream alternative initiation codons compete with the primary initiation codon for ribosomes, so the mutation of downstream start sites would thereby increase initiation of protein synthesis from the upstream start site, even though they knew that the 2006 Matsuda and Dreher article was prior art and had disclosed the same conclusion.

81.    Upon information and belief, at least these individuals had the specific intent to deceive the PTO, shown at least by (1) their knowledge that the 2006 Matsuda and Dreher article disclosed the subject-matter of Claim 1, (2) their simultaneous withholding of the 2006 Matsuda and Dreher article and other material

Noonan Lance Boyer & Banach LLP

prior art references from disclosure to the PTO, and (3) by making arguments during prosecution of the '179 Patent that they knew were contrary to the state of the art.

82.   Had Promosome or the Promosome Scientists, including Stephen Chappell, Gerald Edelman, and Vincent Mauro, disclosed the 2006 Matsuda and Dreher article, the PTO Examiner would have adhered to his initial decision and rejected their patent application as anticipated and obvious in light of prior art.  In other words, but for the failure of Promosome and the Promosome Scientists to disclose the 2006 Matsuda and Dreher article, the '179 Patent would not have issued.

83.   Counterclaim-Plaintiffs are entitled to a declaratory judgment that the '179 Patent was obtained through inequitable conduct and is therefore unenforceable.

## DEMAND FOR JUDGMENT

WHEREFORE, Counterclaim-Plaintiffs Pfizer and BioNTech pray for the following relief:

a.   That the Court order Promosome's complaint be dismissed with prejudice and judgment be entered in favor of Pfizer and BioNTech;

b.   That a judgment be entered declaring that Pfizer and BioNTech's conduct has not infringed the '179 Patent;

c.   That a judgment be entered declaring that Claim 1 of the '179 Patent is invalid;

d.   That a judgment be entered declaring that the '179 Patent is unenforceable;

e.   That a judgement be entered declaring that the '179 Patent was procured through inequitable conduct;

f.   That Promosome and its agents, representatives, attorneys, and those persons in active concert or participation with them who receive actual notice thereof, be preliminarily and permanently enjoined from threatening or initiating infringement litigation against Pfizer and BioNTech or any of its customers, dealers, or suppliers, or any

{02446246}

NOONAN LANCE BOYER & BANACH LLP

prospective or present sellers, dealers, distributors, or customers of Pfizer and BioNTech, or charging any of them either orally or in writing with infringement of the '179 Patent;

g.   That a judgment be entered, declaring that this action is an exceptional case within the meaning of 35 U.S.C. § 285 and that Pfizer and BioNTech are therefore entitled to recover their reasonable attorneys' fees upon prevailing in this action;

h.   That Pfizer and BioNTech be awarded costs, attorney's fees, and other relief, both legal and equitable, to which they may be justly entitled; and

i.   That Pfizer and BioNTech be awarded such other and further relief as is just and proper.

Dated: September 13, 2023          NOONAN LANCE BOYER & BANACH LLP


By:   */s/ David J. Noonan*
David J. Noonan, Esq.
dnoonan@noonanlance.com
Attorney for Defendant and Counterclaim-Plaintiff PFIZER INC.

NOONAN LANCE BOYER & BANACH LLP

{02446246}

1

Dated: September 13, 2023          WILLIAMS & CONNOLLY LLP

2

3
                                 By:    /s/ Thomas H.L. Selby
4                                       Thomas H.L. Selby, Esq.*
5                                       Stanley E. Fisher, Esq.*
                                        Michael J. Mestitz, Esq.*
6

7                                       Attorneys for Defendant and Counterclaim-
                                        Plaintiff PFIZER INC.
8

9

10   Dated: September 13, 2023          PAUL HASTINGS LLP

11

12
                                 By:    /s/ Christopher H. McGrath
13                                      Christopher H. McGrath, Esq.
14                                      Bruce M. Wexler, Esq.*
                                        Eric W. Dittmann, Esq.*
15                                      Scott F. Peachman, Esq.*
                                        Mi Zhou, Esq.*
16

17                                      Attorneys for Defendants and Counterclaim-
                                        Plaintiffs BIONTECH SE AND BIONTECH
18                                      GMBH

19
                                        * *Pro hac vice* application forthcoming
20

21

22

23

24

25

26

27

28

NOONAN LANCE BOYER & BANACH LLP

{02446246}

65

# INDEX OF EXHIBITS

| Exhibit | Description | Page |
|:---:|:---|:---:|
| 1 | Chappell, Edelman, and Mauro *PNAS* Article | 69 |
| 2 | 2006 Matsuda and Dreher Article | 76 |

{02446246}

**Case No. 3:23-CV-01048-JES-MMP**

# PROOF OF SERVICE

***PROMOSOME LLC v. PFIZER INC., BIONTECH SE, and BIONTECH MANUFACTURING GMBH***

United States District Court, Southern District, Case No. 23-CV-01048-JES-MMP

     I, the undersigned, declare: That I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action. My business address is 701 Island Avenue, Suite 400, San Diego, CA 92101.  On September 13, 2023, I served the following document(s) described as

**DEFENDANTS/COUNTERCLAIM-PLAINTIFFS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO PLAINTIFF/COUNTERCLAIM-DEFENDANT PROMOSOME LLC'S COMPLAINT**

on the parties in said action as follows:

| | |
|---|---|
| Christopher Harold McGrath<br>PAUL HASTINGS LLP<br>4747 Executive Drive, 12th Floor<br>San Diego, CA 92121<br>T:    858.458.3000<br>F:    858.458.3005<br>chrismcgrath@paulhastings.com | **Attorney for Co-Defendants**<br>**BioNTech SE and BioNTech**<br>**Manufacturing GMBH** |
| Bill Carmody<br>SUSMAN GODFREY L.L.P.<br>1301 Avenue of the America's 32nd Floor<br>New York, New York 10019<br>T:    212.336.8330<br>bcarmody@susmangodfrey.com | **Attorney for Plaintiff**<br>**PROMOSOME LLC** |
| Joseph Grinstein<br>Shawn Blackburn<br>Taylor C. Hoogendoorn<br>SUSMAN GODFREY L.L.P.<br>1000 Louisiana Street, Suite 5100<br>Houston, TX 77002<br>T:    713.651.9366<br>T:    713.653.7897<br>T:    630.824.8210 Hoogendoorn<br>jgrinstein@susmangodfrey.com<br>thoogendoorn@susmangodfrey.com | **Attorneys for Plaintiff**<br>**PROMOSOME LLC**<br>**Pro Hac Vice** |

NOONAN LANCE BOYER & BANACH LLP

{02446246}

67

1    Amanda K. Bonn                    **Attorney for Plaintiff**
2    SUSMAN GODFREY L.L.P.              **PROMOSOME LLC**
     1900 Avenue of the Stars, Suite 1400
3    Los Angeles, CA 90067-6029        **Lead Attorney (per docket)**
     T:     310.789.3100
4    F:     310.789.3150
     abonn@susmangodfrey.com
5

6    ☒   **BY E-MAIL OR ELECTRONIC TRANSMISSION (ECF):**  I authorized the
7        electronic filing of the foregoing with the Clerk of the Court using the CM/ECF
         system.  Based upon the records currently on file, the Clerk of the Court will
8        transmit a Notice of Electronic Filing to the ECF registrants listed in the service
         list.
9
         I declare under penalty of perjury under the laws of the United States of
10   America that the foregoing is true and correct and that I am employed in the office of
11   a member of the bar of this Court at whose direction the service was made.

12       Executed on September 13, 2023, at San Diego, California.

13

14                                    _/s/ Cindy Frederick_____
                                      Cindy Frederick
15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOONAN LANCE BOYER & BANACH LLP

{02446246}

**Case No. 3:23-CV-01048-JES-MMP**